**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

| | |
|---|---|
| BLAIR REDMOND,<br><br>            Plaintiff,<br><br>      v.<br><br>SAN JOSE POLICE DEPARTMENT, et al.,<br><br>            Defendants. | Case No.  14-cv-02345-BLF<br><br>**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>[Re:  ECF 130] |

Plaintiff Blair Redmond ("Redmond") was sitting in the driver's seat of her parked vehicle near a skateboard park in San Jose, California, when police officers from the San Jose Police Department approached her and her boyfriend to question them for a suspected littering violation. A serious incident broke out between the officers and Redmond's boyfriend, which involved a physical altercation resulting in her boyfriend's arrest.  From the outset, Redmond was recording the events on her cell phone, and at some point during the encounter she got out of the car to continue to record the incident.  She claims that as soon as she got out of the car, one of the officers charged at her, grabbed her arm, stomped on her foot, punched her in the face, and dislocated her shoulder to stop her from filming.  Redmond was ultimately arrested, but not charged, with resisting arrest.

Redmond brings suit under 42 U.S.C. § 1983 against the City of San Jose (the "City") and a number of police officers involved in the events (the "Officers") (together with the City, "Defendants").  Defendants move for summary judgment on all claims.  *See generally* Motion for Summary Judgment, ECF 130 ("Mot.").  The Court has considered the parties' briefing, the admissible evidence, the applicable law, as well as oral argument presented at the hearing held on September 20, 2017.  For the reasons that follow, Defendants' motion for summary judgment is GRANTED IN PART and DENIED IN PART.

# I.    BACKGROUND[1]

## A.    Events Preceding Redmond's Encounter with the Officers

On the afternoon of April 17, 2013, Blair Redmond was with her boyfriend Joseph Evans ("Evans") in a parked car at Roosevelt Park in San Jose, California.  Redmond was sitting in the driver's seat of the car while Evans was seated in the passenger seat fixing his skateboard.  The car was legally parked in a space in the parking lot for a skateboard park.

Officers Daniel Pfiefer, Tony Diep, and Matthew Blackerby were also in Roosevelt Park on April 17, 2013.  As part of the San Jose Police Department's "downtown services unit," these officers were tasked with addressing gang and narcotics activity, as well as responding to "quality of life" issues in downtown San Jose such as vagrants, drinking and urinating in public, and street-level drug dealing. *See* ECF 130-1 Exh. A ("Pfiefer Depo.") 44:21-45:4.  The San Jose Police Department had received numerous complaints regarding gang, drinking, and narcotics activity in Roosevelt Park, and assigned the unit to patrol the area. *Id*. 103:7-105:16.  On the day of the events at issue, Officers Pfiefer, Diep, and Blackerby dressed in plain clothes and drove an unmarked vehicle to Roosevelt Park. *Id*. 68:14-69:15.

The Officers noticed Redmond's car near the skateboard park, and that the vehicle had the front, back, and rear side windows covered by some type of shade or curtains. *Id*. 108:14-109:15.  After patrolling the park for some time, the Officers returned to their vehicle and saw that Redmond's car was still in the parking lot. *See* ECF 130-1 Exh. C ("Blackerby Depo.") 111:24-112:6.  Officers Pfiefer and Diep observed Evans throw "some type of metallic object or objects" out of the passenger side window.  Pfiefer Depo. 110:19-22.  The Officers decided to approach Redmond's car to investigate the littering issue. *Id*. 110:23-111:13.  Redmond recalls that the Officers approached the passenger side of the car where Evans sat, but did not state any reason for their presence at the car. *See* ECF 134-2 ("Redmond Depo.") 95:11-17.

## B.    The Officers' Initial Exchange with Redmond and Evans

Initially, Officer Diep approached the passenger window of the vehicle followed by

---

[1] The facts set forth in this section are merely a summary of the facts and do not represent all facts, disputed or otherwise.  Additionally, the facts are undisputed unless otherwise noted.

1    Officer Blackerby while Officer Pfiefer walked around toward the driver's side of the vehicle

2    where Redmond was located.  *See* ECF 103-1 Exh. B ("Diep Depo.") 132:15-21; Pfiefer Depo.

3    112:14-113:5.  What happened next is subject to various factual disputes.  Officer Diep states that

4    he stood at the passenger side window and identified himself as a San Jose police officer, showed

5    the passengers his badge, and said "how are you guys doing?" Diep Depo. 132:19-133:1; *see also*

6    Redmond Depo. 68:4-7.  After Officer Diep stated something to that effect, Redmond recalls that

7    she and Evans responded: "I want to speak to your sergeant, and we're going to record this

8    incident." Redmond Depo. 68:4-7.  Officer Blackerby testified that as soon as Officer Diep

9    identified himself to the occupants of the vehicle, "the passenger [Evans] started screaming."

10   Blackerby Depo. 114:21-22.  In contrast, Redmond testifies that Officer Diep was intimidating,

11   aggressive, and "escalated" his voice toward her with demands. Redmond Depo. 67:14-19.

12        Officer Diep testifies that he smelled marijuana in the vehicle.  *See* Diep Depo. 148:11-15.

13   According to Diep, Evans then began to roll the passenger side window all the way up, even

14   though Officer Diep instructed Evans not to roll the window up. *Id*. 149: 7-9.  Officer Diep then

15   testifies that he opened the passenger door to the vehicle, which was unlocked. *Id*. 149: 9-14.

16   Redmond testifies that she, not Evans, rolled up the passenger side window and locked the car

17   doors in order to stay safe.  *See* Redmond Depo. 79:14-21; 95:14-17.  Before she was able to roll

18   the passenger window all the way up, Redmond testifies that Officer Diep reached through the

19   open window on the passenger side in order to unlock the door.  The parties do not dispute that

20   once Officer Diep got the door open, he observed Evans sitting in the passenger seat with a

21   skateboard and tools on his lap.

22        Officer Diep testifies that he observed Evans with a box cutter in his left hand. *See* Diep

23   Depo. 150:13-20.  Officer Diep instructed Evans to "put the knife down," but Evans did not

24   comply, instead continuing to yell and move the box cutter around. *Id*. 150:23-151:2.  Officer

25   Diep testifies that he did not reach into the vehicle until after he had given Evans the chance to

26   drop the box cutter. Diep Depo. 151:3-24.  In contrast, Redmond testifies that Diep was trying to

27   remove Evans from the vehicle when Evans was just "sitting there" and Diep was grabbing at him.

28   *See* Redmond Depo. 73:15-18.  Officer Diep claims that Evans continued to move his left hand

3

around in a swiping motion holding the box cutter. Diep Depo. 152:23-154:4. As Officer Diep reached into the vehicle in an attempt to control Evans' hand, the box cutter "shaved off a piece of skin" on Officer Diep's right thumb. *Id*. At that point, Officer Diep pulled his hand back and shouted "he just cut me." *Id*. 153:6-8.

Meanwhile, Officer Pfiefer was outside of the driver's side of the car where Redmond sat and he recalls that he ordered Redmond to get out of the vehicle. Pfiefer Depo. 112:18-113:5. Redmond testifies that at the same time as Officer Diep was grabbing Evans, Officer Pfiefer pounded on her window eight to ten times with his flashlight but was unable to break the window open. Redmond Depo. 98:1-8. Officer Pfiefer testifies that when he heard Officer Diep instruct Evans to drop the knife, he told Redmond to open the door to the car but she refused. Pfiefer Depo. 116:4-24. Only when Redmond refused to open the door did Officer Pfiefer recall that he unsuccessfully tried to break the driver's window of the car with his flashlight in order to open the door. *Id*. 117:20-118:8. A 40-second video of this portion of the incident while Evans and Redmond were still in the car is captured by Redmond's phone. *See* ECF 130-1, Exh. E.

As soon as he heard Officer Diep shout that he had been cut, Officer Pfiefer moved to the front of his vehicle, drew his firearm and pointed it at Evans who immediately raised his arms. Pfiefer Depo. 118:10-119:18. Redmond testifies that Evans' hands were empty at this point. Officers Diep and Blackerby then pulled Evans from the front passenger seat of the car. Diep Depo. 153:18-154:10. A struggle ensued, whereby Officers Diep and Blackerby had difficulty handcuffing and controlling Evans. Diep Depo. 155:5-7. Officer Diep used his radio to call for Code 3 backup. Diep Depo 154:20-155:7. The Officers testify that Officer Blackerby tripped over a cement parking divider and fell on his back with Evans on top of him. Blackerby Depo. 120:17-121:1. Redmond disputes the Officers' version of events, instead asserting that the Officers were on top of Evans, physically attacking him. Redmond Depo. 101:25-102:4

### C. Redmond Gets Out of the Vehicle and is Arrested

While Officers Diep and Blackerby struggled with Evans, Officer Pfiefer was trying to keep an eye on Redmond while simultaneously monitoring the crowd of people that had started to form. Pfiefer Depo. 119:21-120:25. Pfiefer suddenly noticed Redmond "spring out of the car." *Id*.

122:19-25.  Redmond testifies that after seeing Officers Diep and Blackerby on top of her boyfriend behind the car, she decided to get out of the car with her arm extended holding her cell phone to record the incident.  Redmond Depo. 101:25-102:4.

Officer Pfiefer stood between Redmond and the struggle occurring between the other officers and Evans. Pfiefer Depo. 123:13-124:11.  Redmond moved toward him with a cell phone in her hand.  When Officer Pfiefer told her to "back up," he testifies that she responded "Fuck you, I'm recording this shit." Pfiefer Depo. 125:5-11.  Redmond testifies that when she got out of the car she initially "took a step" toward the back of the car toward the officers who were struggling with Evans. Redmond Depo. 103:8-24.  However, she testifies that she immediately started "backtracking." *Id*. 103:14-17.  She continued to record the incident with her outstretched hand, and told Officer Pfiefer that she was recording the incident.  At that point, Redmond testifies that Officer Pfiefer charged toward her and told her that she was under arrest. Redmond Depo. 104:1-13.

Redmond disputes Officer Pfiefer's account of her arrest.  Officer Pfiefer's version of events is that he reached out to grab her hand in order to control her and take her into custody. Pfiefer Depo. 126:10-25.  When Redmond pulled her arm away, she lunged backward and tripped and fell. Pfiefer Depo. 131:14-21.  As she tried to get back up, Officer Pfiefer grabbed her leg and tried to keep her nearby due to the crowd of people forming around them.  When Redmond refused commands to roll over and tried to get up, Officer Pfiefer admits that he grabbed her hair to keep her on the ground and then "hit her with his fist" on the side of her head in an attempt to end the fight and allow him to take control. *Id*. 132:8-137:22.  Redmond stopped resisting at that point and Officer Pfiefer was able to handcuff her. *Id*.

According to Redmond, Officer Pfiefer charged at her and grabbed her right hand in an attempt to take away her phone.  Redmond Depo. 104:1-3.  When he lost his grip, he stomped on her foot to pin her in place. *Id*. 104:17-18.  When she stumbled backwards after the stomp, Officer Pfiefer then punched her in the face. *Id*. 106:2-3.  She then fell to the ground in a "crouched position" covering her head and face with her hands. *Id*. 87:16-19.  Redmond testifies that Officer Pfiefer then pulled her back up by her hair and wrenched her arm behind her back until she "heard

1  a loud pop" and felt pain in her right shoulder, which she eventually learned was dislocated from

2  the incident. *Id.* 108:17-109:1, 110:1-12, 111:15-112:3.  Redmond further testifies that Officer

3  Pfiefer pushed her face down onto the concrete and pinned her left shoulder down with his knee.

4  Redmond Depo 115:7-116:4.  Officer Pfiefer denies that he ever wrenched Redmond's arm behind

5  her back or pinned her down with his knee. Pfiefer Depo 139:15-140:13.

6      Once Redmond was in handcuffs, she was turned over to Officer Wendy Hoskin who had

7  arrived on the scene after the events described above took place.  Officer Hoskin performed a pat

8  down search of Redmond.  While Redmond contends that the pat down was "quick" and "not

9  overly rough" but not gentle, she also asserts that the pat down involved lifting Redmond's shirt in

10  front of numerous witnesses, revealing the skin between "an inch" below Redmond's bra to "right

11  above my belly button." Redmond Depo. 59:16-17; 58:20-59:10.  According to Officer Hoskin,

12  the pat-down search that she performed on Redmond was standard. Hoskin Depo. 89:17-91:14.

13      Eventually, Sergeant Donald Perrier arrived on the scene, and he was informed that

14  Redmond wanted to speak with him.  Instead of speaking with her about the incident, Redmond

15  testifies that Sergeant Perrier accused her of assaulting "his" police officers. *See* Redmond Depo.

16  65:16-66:5.  Redmond contends that Sergeant Richard Galea, who was responsible for supervising

17  Officers Pfiefer, Diep, and Blackerby, but who was never on the scene that day, was similarly

18  uninterested in hearing about his officers' conduct.  According to Redmond, all of the

19  approximately 8 to 10 officers from the San Jose Police Department who arrived on the scene in

20  Roosevelt Park on April 17, 2013 are responsible for the events that transpired because they were

21  "indifferent to the brutality" and never asked what crime Redmond was accused of committing.

22      **D.      Redmond's Claims against the City and the Officers**

23      Redmond initially filed this case *pro se* against the City of San Jose and five police

24  officers. *See* ECF 1 (Filed May 20, 2014).  On October 2, 2015, the Court appointed counsel for

25  Redmond. *See* ECF 81.  Counsel for Redmond eventually filed a Fourth Amended Complaint,

26  which is the operative pleading in this case. *See* Fourth Amended Complaint ("4AC"), ECF 86.

27  On June 7, 2016, the Court denied Defendants' motion to dismiss the Fourth Amended Complaint

28  with respect to the supervisors (Sergeants Perrier and Galea) and Officer Hoskin. *See* ECF 102.

Redmond seeks to hold eight individual police officers as well as the City of San Jose ("City") accountable for violations of her constitutional rights and of state law.[2]  Specifically, Redmond alleges that the individual officers deprived her of the right to be free from retaliation as guaranteed by the First Amendment (First Cause of Action ("COA")).  She also alleges Fourth Amendment violations including excessive force (Second COA), unlawful arrest (Third COA), unreasonable search of her person (Fourth COA), and unreasonable search and seizure of her vehicle (Sixth COA). *See generally* 4AC, ECF 86.  Redmond also seeks to hold the City liable for these § 1983 violations for its pattern and practice of ongoing constitutional violations under *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978), and to hold Sergeants Perrier and Galea liable under § 1983 as supervisors.

Redmond also brings a host of derivative state law claims against Defendants including battery (Fifth COA), violation of California Civil Code § 52.1 ("Bane Act") (Seventh COA), Intentional Infliction of Emotional Distress (Eighth COA), False Arrest/Imprisonment (Ninth COA), and Negligent Infliction of Emotional Distress (Tenth COA).  Finally, Redmond alleges a violation of the Fourteenth Amendment's equal protection clause (Eleventh COA). *See* 4AC ¶¶ 80-153.

## II.    LEGAL STANDARD

### A.    Summary Judgment

"A party is entitled to summary judgment if the 'movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1049 (9th Cir. 2014) (quoting Fed. R. Civ. P. 56(a)).  Material facts are those that may affect the outcome of the case.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A genuine dispute of material fact exists if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party.  *Id*. at 248–49.

---

[2] In addition to the officers described in the factual background above (Officers Pfiefer, Blackerby, Diep, Hoskin, Perrier, and Galea) the Fourth Amended Complaint also names Officer Alan Mishaga and Officer Andrew Wong as individual officer defendants. 4AC ¶¶ 12-13.  Redmond alleges that Officers Mishaga and Wong pinned her down along with Officer Pfiefer after she attempted to video tape the incident. *Id*.

The party moving for summary judgment bears the initial burden of informing the court of the basis for the motion, and identifying portions of the pleadings, depositions, answers to interrogatories, admissions, or affidavits that demonstrate the absence of a triable issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). To meet its burden, "the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000).

If the moving party meets its initial burden, the burden shifts to the nonmoving party to produce evidence supporting its claims or defenses. *Id.* at 1103. If the nonmoving party does not produce evidence to show a genuine issue of material fact, the moving party is entitled to summary judgment. *Celotex*, 477 U.S. at 323. "The court must view the evidence in the light most favorable to the nonmovant and draw all reasonable inferences in the nonmovant's favor." *City of Pomona*, 750 F.3d at 1049. However, "the 'mere existence of a scintilla of evidence in support of the plaintiff's position'" is insufficient to defeat a motion for summary judgment. *Id.* (quoting *Anderson*, 477 U.S. 242, 252 (1986)). "'Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.'" *Id.* (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

**B.    Qualified Immunity**

"The doctrine of qualified immunity protects government officials from liability for civil damages 'unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct.'" *Wood v. Moss,* 134 S.Ct. 2056, 2066–67 (2014) (quoting *Ashcroft v. al-Kidd,* 131 S.Ct. 2074, 2080 (2011)). "[T]he Supreme Court has 'repeatedly ... stressed the importance of resolving immunity questions at the earliest possible stage in litigation.'" *Dunn v. Castro*, 621 F.3d 1196, 1199 (9th Cir. 2010) (quoting *Hunter v. Bryant,* 502 U.S. 224, 227 (1991)). Under the applicable pleading standard, the plaintiff must allege facts sufficient to make out a plausible claim that it would have been clear to the defendant officer that his conduct was unlawful in the situation he

confronted. *Id.* at 2067. "Because qualified immunity is an affirmative defense from suit, not merely from liability, '[u]nless the plaintiff's allegations state a claim of violation of clearly established law, a defendant pleading qualified immunity is entitled to dismissal before the commencement of discovery.'" *Doe By and Through Doe v. Petaluma City School Dist.,* 54 F.3d 1447, 1449–50 (9th Cir. 1995) (quoting *Mitchell v. Forsyth,* 472 U.S. 511, 526 (1985)).

In *Saucier v. Katz,* 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001), the Supreme Court set forth a two-part approach for analyzing qualified immunity. The analysis contains both a constitutional inquiry and an immunity inquiry. *Johnson v. County of Los Angeles,* 340 F.3d 787, 791 (9th Cir.2003). The constitutional inquiry requires the court to determine this threshold question: "Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" *Saucier,* 533 U.S. at 201. If the Court determines that a constitutional violation could be made out based on the parties' submissions, the second step is to determine whether the right was clearly established. *Id.* "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.* at 202. The Supreme Court has clarified that the *sequence* of analysis set forth in *Saucier* is not mandatory and that a court may exercise its sound discretion in determining which of the two prongs of the qualified immunity analysis to address first. *Pearson v. Callahan,* 555 U.S. 223, 241-42 (2009). Thus, in some cases, it may be unnecessary to reach the ultimate constitutional question when officers would be entitled to qualified immunity in any event, a result consistent with longstanding principles of judicial restraint.

The Supreme Court recently reiterated the longstanding principle that a "clearly established" constitutional right "should not be defined 'at a high level of generality.'" *White v. Pauly*, 137 S. Ct. 548, 552 (2017) (quoting *al-Kidd*, 563 U.S. at 742). Rather, it must be "particularized" to the facts of the case." *Id.* (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). Defining the right at too high a level of generality "avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced." *Plumhoff v. Ricard*, 134 S.Ct. 2012, 2023 (2014). "[A] defendant cannot be said to have violated a clearly

United States District Court
Northern District of California

9

established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it." *Id.* "In other words, 'existing precedent must have placed the statutory or constitutional question' confronted by the official 'beyond debate.'" *Id.* (quoting *al-Kidd*, 563 U.S. at 741). "A right can be clearly established despite a lack of factually analogous preexisting case law, and officers can be on notice that their conduct is unlawful even in novel factual circumstances." *Ford v. City of Yakima*, 706 F.3d 1188, 1195 (9th Cir. 2013). "The relevant inquiry is whether, at the time of the officers' action, the state of the law gave the officers fair warning that their conduct was unconstitutional." *Id.*

## III. DISCUSSION

Defendants move for summary judgment on all of Redmond's claims. *See generally* Mot. The Court seeks to respond to the motion as submitted by the moving party. However, in the interests of efficiency, the Court addresses Redmond's theory of direct liability for constitutional claims against individual officers, and separately addresses Redmond's claims for supervisor liability as to Sergeants Perrier and Galea, and her *Monell* claim against the City itself. The Court also recognizes that Redmond has brought claims against two officers who were not directly involved in the events described above. Because the Court finds that no genuine dispute of material fact exists as to the claims against these Defendants, the Court addresses their liability before turning to Redmond's claims under a direct theory of liability against Officers Pfiefer, Blackerby, Diep, and Hoskin, and then ultimately turns to her theories of supervisory liability and her *Monell* claim.

### A. Claims Against Officers Mishaga and Wong

Officers Mishaga and Wong are charged with unlawful arrest (Third COA), unlawful search (Fourth COA), and possibly excessive force (Second COA). *See generally* 4AC. Each officer testified that he arrived at the scene after Redmond was already in the police vehicle. *See* Mishaga Depo. 68:9-70:25, ECF 130-1 Exh. I; Wong Depo. 63:6-8, 98:16-19, ECF 130-1 Exh. J.

At the hearing on September 20, 2017, counsel for Redmond submitted on the papers as to Officers Mishaga and Wong. Redmond's opposition does not mention these officers. Moreover,

1    although Redmond testifies that an unidentified officer may have pinned her down along with

2    Officer Pfiefer, there is no evidence to create a triable issue of fact as to these officers' liability.

3    Therefore, Defendants' motion for summary judgment as to Officers Mishaga and Wong is

4    GRANTED.

5    **B.    Direct Liability for Constitutional Violations**

6    **1.    Retaliation Claim**

7    Redmond seeks to hold a number of the Officer Defendants, as well as the City, liable for

8    retaliating against her in violation of her First Amendment right to videotape police officers while

9    they are performing their duties in a public place.  In her Fourth Amended Complaint, Redmond

10   alleges the retaliation claim against Officer Pfiefer, Sergeant Perrier, Sergeant Galea, and the City

11   itself. *See* 4AC ¶¶ 80-88, ECF 86.  However, in her opposition to Defendants' motion for

12   summary judgment, Redmond asserts that Officers Blackerby and Diep are also directly liable for

13   First Amendment violations. *See* Opp'n at 5.  The Court addresses the First Amendment claims

14   against Sergeants Perrier and Galea as supervisors, and the *Monell* claim against the City,

15   separately from her theories of direct liability.  Here, the Court considers Redmond's First

16   Amendment claim against Officers Pfiefer, Blackerby and Diep.

17   **a.    Officer Pfiefer**

18   The bulk of the arguments regarding the retaliation claim center on the actions of Officer

19   Pfiefer, because he is the officer who allegedly prevented Redmond from videotaping the incident

20   by arresting her and taking her into custody.  Defendants primarily argue that Officer Pfiefer had

21   legitimate law enforcement reasons to take Redmond into custody and that his actions were not

22   motivated because she was filming the event on her cell phone.

23    Although Defendants do not explicitly move for qualified immunity on the retaliation

24   claim in their motion for summary judgment as to Officer Pfiefer, they insinuate that in the context

25   of an inherently dangerous situation, the "law is not clearly established when it comes to whether a

26   person has the right to videotape the incident." Mot. at 9.  Redmond preempted the qualified

27   immunity argument on the retaliation claim in a footnote of her opposition. *See* Opp'n at 5 n.2.  It

28   is not until Defendants' reply that they explicitly assert that Officer Pfiefer is entitled to qualified

immunity on the retaliation claim. *See* Reply at 5-6. The Court considers both prongs of the qualified immunity analysis, and finds that disputed factual issues, including the nature of Redmond's participation in the incident, preclude granting summary judgment on the retaliation claim as to Officer Pfiefer.

### i.    Constitutional Violation

The Court must first consider whether the facts viewed in the light most favorable to Redmond support a violation of her First Amendment rights. In order to sustain a claim of retaliation in violation of the First Amendment, Redmond must establish three elements: (1) she was engaged in constitutionally protected activity; (2) Officer Pfiefer's actions would chill a person of ordinary firmness from continuing to engage in the protected activity in the future; and (3) Officer Pfiefer's intent to inhibit the protected speech was a substantial or motivating factor in his conduct. *See Pinard v. Clatskanie Sch. Dist. 6J*, 467 F.3d 755, 770 (9th Cir. 2006); *accord Skoog v. Cty. of Clackamas*, 469 F.3d 1221, 1231-32 (9th Cir. 2006).

Defendants concede that citizens have a First Amendment right to videotape police officers who are performing their duties in a public space. *See* Mot. at 8 (citing *Fordyce v. City of Seattle*, 55 F.3d 436, 439 (9th Cir. 1995)). However, Defendants argue that the right is subject to "serious limitations" that are implicated by the "undisputed" facts of this case. *Id*. at 9. By characterizing Redmond as an active player in an "inherently dangerous" encounter with the police, Defendants insinuate that she did not have a right to record them because she was suspected of resisting, delaying, or obstructing police officers in the course of their duties. *See* Mot. at 9. Defendants argue that even viewing the facts in the light most favorable to Redmond, Officer Pfiefer did not violate her First Amendment rights as a matter of law. *See* Mot. at 9.

The entire premise of Defendants' argument on the retaliation claim is based on facts which are disputed. Importantly, whether Redmond was merely a passenger who was recording the incident from a safe distance, or whether she was "actively involved" in the incident and threatening the safety of the officers, presents a factual dispute for the jury to decide. The following disputed issues of fact prevent Defendants from meeting their burden on summary judgment as to the First Amendment claim against Officer Pfiefer.

12

By way of background, Redmond testifies that she told the officers that she was recording the incident from the first moment that they made contact with Redmond and Evans to investigate the littering incident. As soon as Officer Diep approached Redmond's car, Redmond and Evans informed him that they wanted to speak to his sergeant and that they were going to record the officers. *See* Redmond Depo. 68:4-7. Redmond then proceeded to record the exchange with the officers on her cell phone while she and Evans were still in the vehicle, resulting in a 40 second video. *See* ECF 130-1, Exh. E.

The events that unfolded when the officers approached the car are disputed. Defendants argue that it is undisputed that Redmond "refused commands from Officer Pfiefer to exit the car." Mot. at 9. Redmond does testify that she heard Officer Pfiefer say "open the door" when he approached the driver side of her car. Redmond Depo. 95:4-7. A reasonable jury could interpret the video of the incident to confirm Redmond's account that she was only told to open the door. *See* ECF 130-1, Exh. E. Redmond further testifies that she did not recall hearing Officer Pfiefer say anything else to her through the cracked window on the driver's side of the car. Redmond Depo. 95:18-23. Rather, she testifies that while Officer Diep was trying to remove Evans from the car, Officer Pfiefer "was attempting to break the window to retrieve me." Redmond Depo. 73:3-6. Redmond's testimony makes clear that Officer Diep was the primary officer that she and Evans were communicating with while they were in the car, because Diep "was the only one trying to like get into the car or who was able to get into the car." 95:22-96:10.

According to Redmond, Officers Diep and Blackerby eventually removed Evans from the car, and Officer Pfiefer then moved from the driver's side of the car to the passenger side. *Id*. 101:3-5. Redmond testifies that from the driver's seat, she looked through the back of her windshield and saw that the officers were on top of Evans, and she "wanted to record it," so she stepped out of the car. *Id*. 101:20-102:4.

Defendants unsuccessfully attempt to persuade the Court that what happened after Redmond got out of the car is also undisputed, but calling the officers' version of events "undisputed facts" does not make them so. Two starkly different accounts emerge from the deposition testimony. Although unbeknownst to Redmond, her phone had stopped recording the

incident and there is no video after the initial 40 seconds of the exchange, corroboration is not required to establish a genuine issue of material fact when the issue is established by sworn testimony. *See Fordyce v. City of Seattle*, 55 F.3d 436, 439 (9th Cir. 1995).

Officer Pfiefer testifies that when Redmond got out of the car to record the incident with Evans, he instructed her to back up while she was advancing toward the officers. *See* Pfiefer Depo.125:9-11. According to Officer Pfiefer, Redmond responded, "fuck you, I'm recording this shit," and continued advancing toward the officers "with her arm outstretched." *Id*. 125:21-126:2. Officer Pfiefer then recalls giving her arrest commands, instructing her to turn around and place her hands behind her back. *Id*. He argued that she did not comply with his commands, although he admits that she "barely" moved backwards. *Id*. 126:4-7.

Unsurprisingly, Redmond disputes Officer Pfiefer's account of their interaction. When Redmond got out of the car to record the incident, she testifies that she took only "two steps" toward the back of the car before she immediately started backtracking. *See* Redmond Depo. 103:14-17. At that point, Officer Pfiefer was already charging at her. *Id*. 104:1-3. Redmond concedes that Officer Pfiefer told her that she was under arrest, but she did not hear any further commands from him because people in the crowd that had gathered were yelling. *Id*. 113:14-19. She also recounts Officer Pfiefer's physical contact with her, which is addressed more fully below in the context of her excessive force claim. For purposes of the First Amendment violation, it matters that Officer Pfiefer attempted to grab her arm while she had her phone in her hand, and believed she was recording the incident. *Id*. 104: 23-105:25. Redmond testifies that when Officer Pfiefer grabbed her phone, she "pulled it away and said 'I'm going to record this,' with the camera still facing him." *Id*. 105:20-22. After stepping on her foot, punching her in the face, and pulling her back up from the ground by her hair, Officer Pfiefer allegedly "grabbed [Redmond's] right arm which still had [her] phone in it, and he wrenched it, at which time [her] phone dropped." Redmond Depo. 88:5-8.

Based on the divergent accounts offered by Officer Pfiefer and Redmond, it is disputed whether Redmond was a suspect who was interfering with the police officers' duties, or whether she was merely a co-occupant of a vehicle who happened to have a front row seat to the events

14

that unfolded. A rational jury could credit Redmond's testimony, as well as the video evidence, and conclude that she was a passive onlooker –albeit one who was dating the suspect – who got out of the car to record the police encounter with her boyfriend. A juror who accepted Redmond's testimony that Officer Pfiefer immediately charged at her and tried to grab her phone away from her could reasonably conclude that the officer did so in order to stop her from recording the incident. It is similarly disputed whether Redmond's conduct posed a danger to the officers, and whether Officer Pfiefer had probable cause to arrest her. Thus, Redmond has submitted sufficient evidence on the first element of a retaliation claim, that Redmond was engaged in constitutionally protected activity, to defeat summary judgment.

Defendants do not challenge the second element of a retaliation claim. Redmond testifies that Officer Pfiefer physically attacked and arrested her while she was recording the officers. These alleged actions would chill a person of ordinary firmness from continuing to engage in the protected activity in the future. *See Ford v. City of Yakima*, 706 F.3d 1188, 11983 (9th Cir. 2013).

Defendants do take aim at what they perceive to be Redmond's failure to satisfy the "causation" requirement of her First Amendment claim. *See* Mot. at 9-10. To succeed on a retaliation claim, Redmond also must prove that Officer Pfiefer's intent to inhibit her protected activity (recording the officers) was a substantial or motivating factor in his conduct. The standard requires Redmond to prove "that [Officer Pfiefer's] desire to chill [her] speech was a but-for cause of [his] allegedly unlawful conduct." *See Ford v. City of Yakima*, 706 F.3d at 1193 (citing *Lacey v. Maricopa County,* 693 F.3d 896, 916–17 (9th Cir.2012) (en banc)).

Defendants argue that Officer Pfiefer's alleged interruption of Redmond's videotaping was not the but-for cause of his actions to grab her arm, arrest her, and take her into custody. Instead, his conduct was motivated by "numerous legitimate reasons." *See* Mot. at 10. The Court agrees with the legal standard cited by Defendants, that if the plaintiff establishes the elements of a retaliation claim, the defendant "can escape liability by showing that it would have taken the same action even in the absence of the protected conduct." *Keyser v. Sacramento City Unified Sch. Dist.*, 265 F.3d 741, 750 (9th Cir. 2001). Yet the Ninth Circuit has also made clear that Defendants must show more than that they "could have" taken the actions in the absence of

protected speech.  Defendants have the burden at trial to establish that they *would have* taken the actions in the absence of her recording the incident. *Settlegoode v. Portland Pub. Schs.,* 371 F.3d 503, 512 (9th Cir.2004); *accord Pinard*, 467 F.3d at 770.

The Court finds that Redmond's testimony, as well as the video recording, constitute sufficient evidence on which a reasonable jury could find that Officer Pfiefer acted with a retaliatory motive.  Defendants concede that Officer Pfiefer's actions came close in time to Redmond's attempt to videotape the officers who were struggling with her boyfriend on the ground, but they argue that Redmond fails to present any further evidence of retaliatory motive. *See* Reply at 4.  Viewing the evidence in Redmond's favor, a reasonable juror could conclude that her recording of the incident was the but-for cause of Officer Pfiefer charging at her and grabbing her phone.  She testified that she immediately told the officers that she was going to record them, and Officer Pfiefer proceeded to bang on her window with his flashlight to try to get her out of the car – which a reasonable jury could determine is corroborated by the video evidence.  Redmond further testifies that Officer Pfiefer charged at her and grabbed her phone as soon as she stepped out of her car to record the incident.  The Court rejects Defendants' characterization of the facts as showing no more than that Redmond was simply videotaping. *See* Reply at 5.

Defendants further argue that they have carried their burden on summary judgment to demonstrate that Officer Pfiefer had "numerous legitimate reasons" for physically apprehending Redmond.  If Officer Pfiefer would have taken his actions even in the absence of her videotaping the events, that destroys the causal connection between the alleged unconstitutional motive and resulting harm. *See* Reply at 3 (quoting *McComas v. City of Rohnert Park*, 2017 WL 1209934 (N.D. Cal. April 3, 2017)).  But all of these reasons are called into question by Redmond's account of events.  In other words, whether Officer Pfiefer acted with the purpose of preventing Redmond's interference with the officers, to promote officer safety, and to arrest a suspect based on probable cause, hinges on whether the jury accepts his version of events over Redmond's. *See Hines v. Gomez,* 108 F.3d 265, 268 (9th Cir.1997) (holding that circumstantial evidence of retaliation, combined with the jury's rejection of the defendant's purported reason for punishing the plaintiff, warranted the jury's finding that the defendant took the action in retaliation for the

16

1  plaintiff's exercise of his rights).

2      Again, accepting Defendants' argument on this point requires accepting their version of the

3  facts. Redmond's account of the incident does not support the position that Officer Pfiefer had

4  legitimate reasons to arrest her and that he would have done so if she was not recording them.

5      The Court cannot resolve the factual disputes in the record in favor of Officer Pfiefer at

6  summary judgment. A genuine issue of material fact exists as to whether Officer Pfiefer charged

7  at and arrested Redmond in an attempt to prevent her from exercising her First Amendment right

8  to record the police officers who were struggling with Evans, after Redmond had made her

9  intention to record the officers clear from the outset. Redmond testified that her physical struggle

10  with Officer Pfiefer involved numerous attempts by him to grab her phone away from her while

11  she pointed the camera at him, and ultimately he caused her to drop the camera and prevented her

12  from recording the events. Officer Pfiefer may ultimately prevail on his causation arguments, but

13  at the very least, "these claims merit a trial." *Fordyce*, 55 F.3d at 439.

14                    **ii.       Clearly Established**

15      As explained above, a reasonable jury could credit Redmond's testimony and find that

16  Officer Pfiefer violated her constitutional rights. The Court next considers whether Officer Pfiefer

17  is nevertheless entitled to summary judgment under the second prong of qualified immunity.

18  Defendants argue that the law was not clearly established that Redmond—who they characterize

19  as an active participant in the incident—had a First Amendment right to record the officers under

20  these circumstances. Again, Defendants frame their arguments using facts in the record that are

21  disputed by Redmond's testimony. Defendants argue that no clear law "prohibits an officer from

22  physically arresting a person (which may incidentally prevent that person from videotaping) *who*

23  *is actually involved in an incident and who may be seen as interfering with the officers* [sic]

24  *duties, or in this case, who is seen as creating a safety risk to other officers*." Reply at 5 (emphasis

25  added). The nature of Redmond's involvement, her interference with the officers, and the safety

26  risk she posed to the officers are all questions of fact for the jury to decide and do not

27  appropriately guide the Court on qualified immunity.

28

On summary judgment, the right in question under the second prong of qualified immunity is framed by the plaintiff's version of the facts, not the defendant's. *See Torres v. City of Los Angeles*, 548 F.3d 1197, 1210 (9th Cir. 2008) (explaining that "defendants are only entitled to qualified immunity as a matter of law if, taking the facts in the light most favorable to [the plaintiff], they violated no clearly established constitutional right"). Under Redmond's version of the facts, the Court asks whether a reasonable officer in Officer Pfiefer's position would know that his conduct was unlawful under the circumstances. *See Saucier v. Katz*, 533 U.S. 194, 201 (2001). The Court therefore must credit Redmond's testimony that she saw the police on top of her boyfriend, got out of the car to record their arrest of Evans with her phone, informed the officers that she was recording, and took merely two steps toward the officers before she immediately backtracked. Further, Redmond testifies that when Officer Pfiefer saw her get out of the car to record the incident, he charged at her, grabbed her phone away, and arrested her in an attempt to stop her from recording. Under these circumstances, the law was clearly established such that a reasonable officer would be on notice that his conduct was unconstitutional.

As of April 17, 2013, the date of the incident in question, the constitutional right to be free from retaliation while recording police activity in a public place was clearly established in the Ninth Circuit. *Fordyce*, 55 F.3d at 439. This is because the First Amendment protects a "right to film matters of public interest." *Fordyce v. City of Seattle*, 55 F.3d 436, 439 (9th Cir. 1995). A majority of other circuits agree. *See Glik v. Cunniffe*, 655 F.3d 78, 83 (1st Cir. 2011) (holding that "the First Amendment protects the filming of government officials in public spaces."); *see also Smith v. City of Cumming*, 212 F.3d 1332, 1333 (11th Cir. 2000) ("The First Amendment protects the right to gather information about what public officials do on public property, and specifically, a right to record matters of public interest."). Therefore, on the day in question, Redmond had "a clearly established right to record police officers carrying out their official duties." *Crago v. Leonard*, No. 13-cv-531, 2014 WL 3849954, at *4 (E.D. Cal. Aug. 5, 2014), *report and recommendation adopted*, 2014 WL 4435954 (E.D. Cal. Sept. 9, 2014); *see also Adkins v. Limtiaco*, 537 Fed.Appx. 721, 722 (9th Cir. 2013) (unpublished) (right to photograph police officers in a public place is clearly established).

18

Even crediting Defendants' contention that Officer Pfiefer had non-retaliatory justifications to arrest Redmond for her failure to obey his commands, the law is clearly established in the Ninth Circuit that there is a right to be free from retaliation even if the officer had probable cause to arrest. *See Skoog*, 469 F.3d at 1235. Accepting, as the Court must, Redmond's contention that Officer Pfiefer grabbed her phone and punched her in an attempt to stop her from recording, a reasonable officer would have known that he cannot retaliate against a citizen for recording the police in a public place, even if the officer was also acting to protect the safety of officers or to arrest her based on probable cause. *See McComas*, 2017 WL 1209934, at *7. In light of *Fordyce*, which Redmond relies on in her opposition, no reasonable officer under the circumstances would believe that Officer Pfiefer's alleged actions were lawful under the First Amendment. *See also Glik v. Cunniffe*, 655 F.3d 78, 85 (1st Cir. 2011) (affirming district court's denial of qualified immunity on retaliation claim because, "though not unqualified, a citizen's right to film government officials, including law enforcement officers, in the discharge of their duties in a public space is a basic, vital, and well-established liberty safeguarded by the First Amendment.").

In *Fordyce*, the Ninth Circuit held that citizens have the right to film matters of public interest. 55 F.3d at 439. A genuine issue of material fact existed because Fordyce testified that the officers deliberately and violently smashed his camera into his face while he was participating in a public protest and gathering information. *Id*. In the decades since *Fordyce* came down, district courts in this circuit have continuously recognized a clearly established right to peacefully film police officers carrying out their duties in public. *See, e.g.*, *McComas*, 2017 WL 1209934, at *7 ("A reasonable officer in [defendant's] position would have known that it is a violation of a constitutional right to harass an individual who is peacefully filming the officer."); *Barich v. City of Cotati*, No. 15-CV-00350-VC, 2015 WL 6157488, at *1 (N.D. Cal. Oct. 20, 2015) ("Thus, 'under the law of this circuit there is and was' at the time of [the defendant's] conduct 'a clearly established right to record police officers carrying out their official duties.'").[3]

---

[3] The Court recognizes that these district court cases, as well as *Higginbotham*, were decided after the incident occurred in this case and thus do not, on their own, "clearly establish" the law at the

United States District Court
Northern District of California

*Naveed v. City of San Jose* is particularly instructive. No. 15-CV-05298-PSG, 2016 WL 2957147, at *5 (N.D. Cal. May 23, 2016). In that case, when officers ordered the plaintiffs' friends to get out of their cars and arrested them, the two plaintiffs took out their cell phones and began filming the encounter. *Id.* The plaintiffs claim that the officers slammed them into the car, arrested them both and confiscated their cell phones for recording the incident. *Id.* The defendants attempted to argue that their case was different from *Fordyce* because the plaintiffs were actually gathering evidence of their own arrest, not the arrest of their friends. The court rejected their argument and held that the relevant acts at issue involved plaintiffs recording the arrest of their friends, which they had a First Amendment right to do. *Id.* Here, Redmond similarly had a First Amendment right to record the officers who were on the ground struggling to arrest her boyfriend, the subject of the police activity. As explained above, a reasonable jury could conclude that Redmond was not the subject of the police activity and was not impeding the police officers by recording the encounter. Under the second prong of qualified immunity, the right to do so has been clearly established since 1995.

The cases relied on by Defendants are not persuasive, because applying them to this case would require the Court to resolve factual disputes in favor of the officers. To support their argument that the right to record a police officer does not apply when a suspect involved in the incident is the one videotaping the incident, Defendants rely on *Higginbotham v. City of New York*, 105 F. Supp. 3d 369 (S.D.N.Y. 2015). Mot. at 9. In *Higginbotham*, the plaintiff was a freelance journalist who tried to get a better vantage point to record the police who were forcefully arresting a different individual. 105 F. Supp. 3d at 372. Higginbotham, who had climbed to the top of a telephone booth to record the incident, was ordered to come down by the officers. He alleged that as he climbed down, the officers grabbed his legs out from under him causing him injury and breaking his camera. The district court *denied* the officers' motion to dismiss the First Amendment retaliation claim based on qualified immunity. *Id.* at 379-80. The court held that the right to record police activity in public, at least in the case of a journalist who is otherwise

time of the events. Rather, these cases are discussed in order to demonstrate how *Fordyce* has been applied to deny qualified immunity to other officers in similar factual scenarios.

unconnected to the events recorded, was "clearly established" at the time of the alleged events.

The *Higginbotham* court also noted the limits of the right to record the police in a public space, stating that the right "may not apply in particularly dangerous situations, if the recording interferes with the police activity, if it is surreptitious, if it is done by the subject of the police activity, or if the police activity is part of an undercover investigation." 105 F. Supp. 3d at 381. Defendants argue that this dicta warrants granting summary judgment in their favor. *See* Mot. at 8. As explained above, there are disputed facts in the record regarding Redmond's involvement in the incident and her interference with the police officers. If the jury credits Redmond, they could find that she was recording from a reasonable distance and was not impeding the officers' performance of their duties.

Defendants further try to analogize this case to *Kelly v. Borough of Carlisle*, which held that it was not clearly established that the right to record the police extends to an inherently dangerous situation such as a traffic stop. 622 F.3d 248 (3d Cir. 2010). Defendants argue that *Kelly* demonstrates that the law is *still* not clearly established regarding whether a person in an inherently dangerous situation has a right to record the police. *See* Mot. at 9. To the extent *Kelly* conflicts with the Ninth Circuit's pronouncements in *Fordyce*, Defendants' argument is foreclosed. *See Crago v. Leonard, K No. 0877*, No. 2:13-CV-531-TLN-EFB, 2014 WL 3849954, at *4 (E.D. Cal. Aug. 5, 2014), *report and recommendation adopted sub nom. Crago v. Leonard*, 2014 WL 4435954 (E.D. Cal. Sept. 9, 2014) (holding that *Kelly* goes "against the majority of circuit authority, as well as the weight of district-court decisions," and concluding that under Ninth Circuit law "there is and was on December 7, 2012, a clearly established right to record police officers carrying out their official duties.").

According to Redmond, she was a bystander who was recording the police, from a safe distance, as they tackled and arrested her boyfriend. That Officer Pfiefer contends Redmond was "a suspect" who was threatening as she approached the officers with her arm outstretched, presents a factual dispute for the jury to determine before qualified immunity can be resolved. Redmond's right to record the officers—under the circumstances that she testifies to—was clearly

established. Accordingly, Defendants' motion for summary judgment as to the retaliation claim against Officer Pfiefer is DENIED.

### b. Officers Blackerby and Diep

Although the Court allows the claim against Officer Pfiefer to proceed to trial, liability under the First Amendment does not extend to Officers Blackerby and Diep. Redmond argues that "all officers on the scene" are liable for violations of Redmond's First Amendment rights. *See* Opp'n at 8. There is no evidence that Officers Blackerby or Diep took any action against Redmond for videotaping the incident. Yet Redmond seeks to hold them liable for failure to intervene when they witnessed Officer Pfiefer's constitutional violations. *Id.* (quoting *U.S. v. Koon*, 34 F.3d 1416, 1447 n.25 (9th Cir. 1994)).

Redmond is correct that "police officers have a duty to intercede when their fellow officers violate the constitutional rights of a suspect or other citizen." *United States v. Koon,* 34 F.3d 1416, 1447 n. 25 (9th Cir.1994), *rev'd on other grounds,* 518 U.S. 81, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996). However, Redmond ignores the requirement that officers can only be liable for failing to intercede if they had a realistic opportunity to intercede and prevent the constitutional violation. *See Cunningham v. Gates*, 229 F.3d 1271, 1289–90 (9th Cir. 2000); *see also Gaudreault v. Municipality of Salem,* 923 F.2d 203, 207 n. 3 (1st Cir.1990) (granting arresting officers' motion for summary judgment because the officers had no "realistic opportunity" to prevent an attack committed by another officer).

Defendants have met their burden on summary judgment to demonstrate that Redmond lacks any evidence that Officers Blackerby and Diep had a realistic opportunity to intercede and prevent Officer Pfiefer from violating Redmond's constitutional rights. The burden then shifts to Redmond, who has not produced any evidence to show a genuine issue of material fact on this claim. *Celotex*, 477 U.S. at 323. Indeed, the undisputed evidence makes clear that Officers Blackerby and Diep were struggling with Evans at the time Officer Pfiefer allegedly charged at Redmond. Viewing the facts in the light most favorable to Redmond, she testifies that while she was still in the car she saw Officer Diep and Blackerby struggling with Evans through her back windshield. *See* Redmond Depo. 101:20-102:4. She further testifies that the officers "were all

back there on top of [Evans]. And I wanted to record it, so I stepped out of my car." *Id.* Redmond presents no evidence that allows the Court to infer that Officers Blackerby and Diep had a realistic opportunity to intercede while they were simultaneously on top of Evans. Based on the undisputed facts, Officers Blackerby and Diep cannot be held liable for failing to intercede and are entitled to summary judgment on the First Amendment claim.

Redmond further argues, without explanation, that Officers Blackerby and Diep were "integral participants" in the violation of Redmond's First Amendment rights. *See* Opp'n at 8. Again, there is not genuine issue of material fact for the jury to decide on this theory of liability. Integral participation requires an officer to be fundamentally involved in the conduct that allegedly caused the constitutional violation. *See Blankenhorn v. City of Orange*, 485 F.3d 463, 481 n.12 (9th Cir. 2007). There is no evidence in the record that Officers Blackerby and Diep participated in any meaningful way in Officer Pfiefer's alleged retaliation.

Defendants' motion for summary judgment on the First Amendment claim is therefore GRANTED as to Officers Blackerby and Diep.

## 2. Excessive Force

Next, Redmond contends that Officer Pfiefer, Sergeant Perrier, Sergeant Galea, and the City are responsible for using excessive force against her in violation of the Fourth Amendment. *See* Compl. ¶¶ 80-88. Redmond's excessive force claims against Sergeants Perrier and Galea are based on a theory of supervisory liability and are addressed separately, below. Likewise, Redmond's *Monell* claim against the City is discussed below. Thus, the only excessive force claim based on a direct liability theory is brought against Officer Pfiefer.

Redmond seeks to hold Officer Pfiefer liable for using excessive force during the course of her arrest on April 17, 2013. Specifically in opposition to Defendants' motion for summary judgment, Redmond argues that there are disputed issues of fact with respect to whether punching Redmond in the face, throwing her to the ground, pulling her up by her hair, and "violently" handcuffing her constituted unreasonable force under the circumstances. *See* Opp'n at 12. Defendants argue that the excessive force claim against Officer Pfiefer fails because it is undisputed that his use of force was reasonable, and that he is entitled to qualified immunity.

Resolving all factual disputes in favor of Redmond, the Court concludes that disputed facts exist in the record and Officer Pfiefer is not entitled to qualified immunity on the excessive force claim. For the reasons that follow, Defendants' motion for summary judgment on the excessive force claim against Officer Pfiefer is DENIED.

As explained above, a government official sued under § 1983 is entitled to qualified immunity unless the plaintiff shows that (1) the official violated a statutory or constitutional right, and (2) the right was "clearly established" at the time of the challenged conduct. *Plumhoff v. Rickard*, 134 S.Ct. 2012, 2023 (2014) (citing *Ashcroft v. al–Kidd*, 131 S.Ct. 2074, 2080 (2011)). Because Redmond must succeed on both prongs, the Court addresses each in turn. *See Nelson v. City of Davis*, 685 F.3d 867, 875 (9th Cir. 2012). However, where factual disputes exist, summary judgment on the issue of qualified immunity is appropriate only if Defendants are entitled to qualified immunity on the facts as alleged by the non-moving party. *Blankenhorn v. City of Orange*, 485 F.3d 463, 477–78 (9th Cir. 2007). Thus, the Court considers Defendants' assertion of qualified immunity by viewing the disputed facts in Redmond's favor.

### a. Constitutional Violation

Turning to the first prong of qualified immunity at summary judgment, Defendants must show that no rational trier of fact could find that Officer Pfiefer's use of force violated Redmond's Fourth Amendment rights. If the evidence viewed in the light most favorable to Redmond could support a finding of excessive force, then Defendants are not entitled to summary judgment on the excessive force claim. *See Smith v. City of Hemet*, 394 F.3d 689, 701 (9th Cir. 2005) (en banc).

The Fourth Amendment "guarantees citizens the right to be secure in their persons . . . against unreasonable . . . seizures of the person." *Graham v. Connor,* 490 U.S. 386, 394 (1989) (internal quotation marks omitted) (alteration in original). "[A]ll claims that law enforcement officers have used excessive force – deadly or not – in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard." *Id.* at 395; *see also City of Hemet*, 394 F.3d at 700–01.

The "reasonableness" of a particular seizure depends on how it was carried out. *Graham*, 490 U.S. at 395. The "objective reasonableness" of an officer's use of force in a particular case is

determined "in light of the facts and circumstances confronting [him], without regard to [his] underlying intent or motivation." *Id.* at 396–97. "Because this inquiry is inherently fact specific, the determination whether the force used to effect an arrest was reasonable under the Fourth Amendment should only be taken from the jury in rare cases." *Green v. City & Cty. of San Francisco*, 751 F.3d 1039, 1049 (9th Cir. 2014) (internal quotations omitted); *see also Avina v. United States*, 681 F.3d 1127, 1130 (9th Cir. 2012) ("summary judgment or judgment as a matter of law in excessive force cases should be granted sparingly").

Moreover, the Supreme Court has explained that evaluating an excessive force claim "requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham*, 490 U.S. at 396 (internal quotation marks and citation omitted). "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation." *Id.* at 396-97. "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* at 396 (internal quotation marks and citation omitted).

The Ninth Circuit has articulated a three-step approach to *Graham* balancing. *See Glenn v. Washington Cnty.*, 673 F.3d 864, 871 (9th Cir. 2011). First, the court "must assess the severity of the intrusion on the individual's Fourth Amendment rights by evaluating the type and amount of force inflicted." *Id.* (internal quotation marks and citation omitted). Second, the court must "evaluate the government's interest in the use of force." *Id.* Finally, the court must "balance the gravity of the intrusion on the individual against the government's need for that intrusion." *Id.* (internal quotation marks and citation omitted); *see also Meredith v. Erath*, 342 F.3d 1057, 1061 (9th Cir. 2003) ("This standard requires us to balance the amount of force applied against the need for that force.").

Despite the *Graham* factors and the approach laid out in *Glenn*, the Court must keep in mind that "there are no per se rules in the Fourth Amendment excessive force context; rather, courts must still slosh their way through the factbound morass of 'reasonableness.'" *See Mattos v.*

*Agarano*, 661 F.3d 433, 441 (9th Cir. 2011) (quoting *Scott v. Harris*, 550 U.S. 372, 383 (2007)). The Court embarks on that endeavor as follows.

### iii.    Nature and Quality of the Intrusion

First, as to the severity of the intrusion on Redmond's Fourth Amendment rights, the record indicates that the force employed by Officer Pfiefer was at least an intermediate use of force because it was capable of inflicting significant pain and causing serious injury. *See Young v. Cty. of Los Angeles*, 655 F.3d 1156, 1161 (9th Cir. 2011) (holding that pepper spray and baton blows constitute intermediate force that, "while less severe than deadly force, nonetheless present a significant intrusion upon an individual's liberty interests.")

Here, Redmond has put forth evidence that when she got out of the car and began to use her phone to record the officers' encounter with Evans, Officer Pfiefer charged toward her and attempted to grab her right arm. Redmond Depo. 104:1-3; 105:8-25. Redmond testifies that when she pulled her arm away, Officer Pfiefer then "stomped down" on her foot to hold her in place. *Id.* 104:17-18. Then, he punched her in the face with a closed fist. *Id.* 106:2-107:20. Redmond testifies that she fell to a crouched position in response to the blow, after which Officer Pfiefer pulled her up from the ground by her hair. *Id.* 109:20-110:6. At that point, Officer Pfiefer wrenched Redmond's right arm behind her back "so violently" that Redmond "heard a pop," and immediately went limp. *Id.* 110: 7-12; 113:9-11. Finally, Officer Pfiefer shoved her to the ground and placed her in handcuffs. *Id.* 113:11-13. Although Officer Pfiefer describes their physical altercation quite differently, Defendants accept Redmond's "scenario" for the purposes of their motion for summary judgment on the excessive force claim. Mot. at 12.

The Ninth Circuit has recognized that "[t]he police arsenal includes many different types of force, which intrude upon the Fourth Amendment rights of the individual to varying degrees." *Nelson v. City of Davis*, 685 F.3d 867, 878 (9th Cir. 2012). Moreover, "physical blows or cuts often constitute a more substantial application of force than categories of force that do not involve a physical impact to the body." *Id.* (internal quotations and citation omitted). Here, it is undisputed that Officer Pfiefer used physical force on Redmond. However, Defendants correctly point out that "[n]either tackling nor punching a suspect to make an arrest necessarily constitutes

26

excessive force." *Blankenhorn v. City of Orange*, 485 F.3d 463, 477 (9th Cir. 2007). "Not every push or shove, even if it may seem unnecessary in the peace of the judge's chambers, ... violates the Fourth Amendment". *Graham*, 490 U.S. at 396 (internal quotations and citation omitted).

The Court therefore must consider the amount of physical force used against Redmond in light of the governmental interests at stake.

### iv. Governmental Interest in Use of Force

Under *Graham v. Connor*, the Court evaluates the government's interest in the use of force by examining three core factors: (1) the severity of the crime at issue; (2) whether the suspect poses an immediate threat to the safety of the officers or others; and (3) whether the suspect is actively resisting arrest or attempting to evade arrest by flight. 490 U.S. at 396; *see also Deorle v. Rutherford*, 272 F.3d 1272, 1280 (9th Cir. 2001); *Bryan v. MacPherson*, 630 F.3d 805, 826 (9th Cir. 2010). These factors are not exclusive and are "simply a means by which to determine objectively 'the amount of force that is necessary in a particular situation.'" *Deorle*, 272 F.3d at 1280 (quoting *Graham*, 490 U.S. at 396-97). In other words, the Court examines the totality of the circumstances and considers "whatever specific factors may be appropriate in a particular case, whether or not listed in *Graham*." *Franklin v. Foxworth,* 31 F.3d 873, 876 (9th Cir.1994). For example, in some cases the Court may find it necessary to consider the availability of alternative methods of capturing or subduing a suspect. *See City of Hemet*, 394 F.3d at 701.

The totality of the circumstances here suggests that Officer Pfiefer's use of force against Redmond was not justified under the circumstances. As to the first factor, Defendants concede that the suspected crime at issue, littering, was an infraction. *See* Mot. at 12. However, it was Evans, not Redmond, who was suspected of committing the littering infraction. *See* Diep Depo. 132:12-14. Officer Pfiefer admits that Redmond was only arrested for her failure to comply with his commands at various points in the encounter, and not for any other crime. *See* Pfiefer Depo. 129:18-130:21. Thus, the severity of the crime at issue does not justify the force used, and Defendants base their entire argument on the remaining two considerations.

The "most important" factor in considering the governmental interest in the use of force under *Graham* is whether the suspect posed an "immediate threat to the safety of the officers or

others." *City of Hemet,* 394 F.3d at 702 (quoting *Chew v. Gates,* 27 F.3d 1432, 1441 (9th Cir. 1994)). "A simple statement by an officer that he fears for his safety or the safety of others is not enough; there must be objective factors to justify such a concern." *Deorle,* 272 F.3d at 1281. Without pointing to specific evidence in the record, Defendants argue that Redmond's actions demonstrated that she was uncooperative, antagonistic, agitated, and exhibited a "great deal of belligerence." *See* Mot. at 12. In these circumstances, Defendants argue that even the use of force alleged by Redmond was objectively reasonable. However, viewing the facts in the light most favorable to Redmond, a reasonable jury could find that Redmond did not pose an immediate threat to the safety of the officers or to anyone else at the time of her arrest.

It is undisputed that Redmond was unarmed, and that she was holding her cell phone in at least one hand when she got out of the car. *See* Pfiefer Depo. 124: 2-11. Yet Defendants contend that Redmond was a "hostile suspect" who was moving toward the officers in an attempt to interfere with the altercation that was simultaneously taking place between Evans and Officers Diep and Blackerby. *See* Mot. at 14; Pfiefer Dep. 125:12-126:9 (describing Redmond as "aggressing towards us with her arm outstretched.") Officer Pfiefer testifies that he saw Redmond spring out of the car holding her phone. Pfiefer Depo. 122:23-124:11. He further testifies that as Redmond advanced toward him and the other officers, who were mid-altercation with Evans, Officer Pfiefer told Redmond to back up. *Id.* 125:9-11. According to Officer Pfiefer, Redmond responded "Fuck you, I'm recording this shit," and continued moving toward the officers. *Id.* 125:9-25. At that point, Officer Pfiefer gave Redmond arrest commands, including an instruction to place her hands behind her back. Id. 125:22-126:2. Although Officer Pfiefer admits that Redmond "barely" backed up and did not continue to advance, he then "reached out and grabbed onto her left wrist." *Id.* 126:1-13. At that point, Redmond was under arrest for her earlier failure to comply with Officer Pfiefer's demands to exit the vehicle, as well as for not following his commands to back up and ultimately to put her hands behind her back. *Id.* 126:14-25.

Redmond tells a much different story. She testifies that when she got out of the car to record the officers' altercation with Evans, she took only "two steps" toward the back of the car before she immediately started "backtracking". Redmond Depo. 103:14-17. At that point, she

28

testifies that Officer Pfiefer was already "charging" toward her. *Id*. 104:1-13. She recalls that he tried to grab her phone and she pulled it away, telling him: "I'm going to record this." *Id*. 105:20-25. Redmond testifies that Officer Pfiefer told her that she was under arrest, but people in the crowd that had gathered were yelling "all kinds of things," so Redmond cannot remember if she or Officer Pfiefer said anything else. *Id*. 113:14-19.

Even under Pfiefer's version of events, the threat that Redmond posed to the officers and others is not clear. Other than her stated desire to record their altercation with Evans, Pfiefer's testimony is essentially that Redmond failed to comply with his commands to back up and put her hands behind her back. Redmond disputes his characterization, stating that she was "backtracking" when he came charging at her, and that she could not hear much of what he said to her over the yelling crowd. To the extent Defendants claim that the crowd of "loud and aggressive onlookers" created safety issues that required the use of force against Redmond, the Ninth Circuit has rejected this generalized safety concern. "A desire to resolve quickly a potentially dangerous situation is not the type of governmental interest that, standing alone, justifies the use of force that may cause serious injury." *Deorle*, 272 F.3d at 1281. "Rather, the objective facts must indicate that the suspect poses an immediate threat to the officer or a member of the public." *Bryan*, 630 F.3d at 826.

According to Redmond, she took "two steps" toward the back of the car with her phone in her hand when Officer Pfiefer came charging at her. The Court cannot conclude as a matter of law that Redmond posed an immediate threat to Officer Pfiefer, to the other officers, or to bystanders in these circumstances.

The third and final consideration under *Graham*'s governmental interest factor is whether the suspect was actively resisting arrest or attempting to evade arrest by flight. 490 U.S. at 396. There is no evidence that Redmond attempted to flee. Moreover, this case is distinguishable from the cases cited by Defendants regarding a suspect actively resisting arrest because here, Redmond disputes that she was actively resisting. *See, e.g.* Redmond Depo. 115:2-116:8 ("Like before I even went to the ground, my arms were behind my back.") Put simply, whether Redmond refused to comply with Officer Pfiefer's commands is disputed in this case. *See Sorgen v. City & Cty. of*

*San Francisco*, No. C 05-03172 TEH, 2006 WL 2583683, at *7 (N.D. Cal. Sept. 7, 2006) ("There is no dispute that [Plaintiff] repeatedly refused to comply with [the Officer's] commands to move back.")  Although Officer Pfiefer claims that he told Redmond to back up and put her hands behind her back before he grabbed her arm, Redmond unequivocally testifies that Officer Pfiefer charged toward her as she was "backtracking." Redmond Depo. 104:8-9.

There are several other disputes of fact, including Officer Pfiefer's contention that he hit her on the side of the head (not the face) only when she was already on the ground and refused to roll over and put her hands behind her back. Pfiefer Depo. 134:17-20.  Redmond contends that she fell to the ground only after Officer Pfiefer punched her, after which he pulled her back up by her hair, wrenched her arm behind her back until she went limp and eventually "shoved" her to the ground. Redmond Depo. 113:8-13.  The vast factual differences between Officer Pfiefer and Redmond's testimony makes clear that whether Redmond was "actively resisting arrest" is a question for the jury.

### v.    Balancing Competing Interests

Resolving all factual disputes in favor of Redmond, the Court concludes that the minimal governmental interests in the use of force are insufficient to justify the force used against her. Ultimately, all of the "core factors" above weigh against a finding that Officer Pfiefer's use of force was reasonable.  The Court is not limited to the *Graham* factors, and may also consider whether less intrusive options were available to Officer Pfiefer at the time of the incident. *See Young v. Cty. of Los Angeles*, 655 F.3d 1156, 1165-66 (9th Cir. 2011).  In *Young*, the Ninth Circuit held that "it is rarely necessary, if ever, for a police officer to employ substantial force without warning against an individual who is suspected only of minor offenses, is not resisting arrest, and, most important, does not pose any apparent threat to officer of public safety." *Id*. at 1167-68.  The Ninth Circuit took into account that less intrusive options were available to the officer: for example, the officer could have given the suspect a warning that disobedience would lead to the use of force against him, or could have "simply begun to effect [the plaintiff]'s arrest by attempting to handcuffing him." *Id*. at 1165-66.  Crediting Redmond's account, a rational jury could conclude that Officer Pfiefer used force before warning her, and before he actually

attempted to handcuff her. *See Deorle*, 272 F.3d at 1284 ("[W]arnings should be given, when feasible, if the use of force may result in serious injury, and…the giving of a warning or the failure to do so is a factor to be considered in applying the *Graham* balancing test.")

The Court recognizes that police officers are often required to make "split second" judgments, and the serious circumstances surrounding this incident, involving a box cutter and a gathering crowd, would have put any reasonable officer on high alert. *See Graham*, 490 U.S. at 397 (finding that police officers must act "in circumstances that are tense, uncertain, and rapidly evolving.") However, there is ample evidence that Redmond was unarmed, did not attempt to flee, did not pose a threat, and did not resist arrest. Consequently, when all of the facts are construed in favor of Redmond as is the standard on summary judgment, a rational jury could find that Officer Pfiefer's use of force was objectively unreasonable. *Accord Young*, 655 F.3d at 1158 (reversing district court's grant of summary judgment on the excessive force claim because "the use of intermediate force is unreasonable when an officer has detained a suspect for minor infractions and the suspect clearly poses no threat to the officer or the public safety.")

Defendants' attempt to distinguish the excessive force inquiry here from the circumstances in *Blackenhorn v. City of Orange* is unpersuasive. 485 F.3d 463 (9th Cir. 2007). In that case, three officers gang tackled the plaintiff in order to arrest him for committing a misdemeanor trespass. *Id*. at 478. There was further evidence that one of the officers punched the plaintiff in the head during the struggle to restrain him. *Id*. at 470. The Court held that a rational jury could find that gang tackling and punching the plaintiff constituted excessive force under the circumstances because there was evidence that the plaintiff committed only a minor crime, and did not pose a threat to the officers. *Id*. at 478. For example, the jury could conclude from the plaintiff's testimony that the officer "never tried to handcuff" the plaintiff, and the plaintiff did not actively resist arrest before he was gang tackled. *Id*. Similarly, Redmond testifies that Officer Pfiefer came charging at her as soon as she got out of the car and proceeded to stomp on her foot, punch her in the face, pull her up by her hair, wrench her arm behind her back and shove her to the ground again before he ultimately placed her in handcuffs. Redmond Depo. 109:10-110:12; 113:9-13. Officer Pfiefer of course gives a different account, but the factual disputes surrounding the

31

encounter prevent the Court from parting from the clear guidance in *Blackenhorn*.

As for the punches, which are particularly relevant here, the Ninth Circuit noted that *even if* the plaintiff initially resisted arrest, "[the officer]'s punches were not necessarily a reasonable response." *Id.* at 480. Crediting the plaintiff's version of events, the Court concluded that a rational jury could find that the plaintiff's actions eliminated the need for any use of force. *Id.* Here, Defendants argue that the use of force was necessary because "Officer Pfiefer was confronted with a hostile suspect moving toward an ongoing attempt to subdue Mr. Evans." Mot. at 14. However, on summary judgment the Court accepts Redmond's testimony that she merely "got out of the car, closed the door, and took two steps." Redmond Depo. 103:20-21. A rational jury drawing all reasonable inferences from Redmond's testimony could conclude that Redmond was *not* moving toward the officers or interfering with their struggle with Evans.

Similarly, Defendants argue that twisting Redmond's arm behind her back cannot constitute excessive force because "there is no evidence" that Officer Pfiefer pulled her arm in any violent or unusual manner. *See* Mot. at 14. Not so. Redmond clearly testifies that Officer Pfiefer "wrenched" her arm "so violently" behind her back that she "heard a pop" and went limp. *See* Redmond Depo. 113:9-13. Finally, Defendants do not cite to any authority to support their position that the use of force was reasonable because it did not cause any visible injury to Redmond.

For the foregoing reasons, Defendants have not demonstrated that Officer Pfiefer's use of force was reasonable under the Fourth Amendment as a matter of law. *See Green v. City & Cty. of San Francisco*, 751 F.3d 1039, 1049 (9th Cir. 2014)(finding that the fact-specific excessive force inquiry "should only be taken from the jury in rare cases."); *accord Chew v. Gates,* 27 F.3d 1432, 1443 (9th Cir.1994) ("[W]hether a particular use of force was reasonable is rarely determinable as a matter of law.") Because a rational jury could conclude that Officer Pfiefer's use of force was objectively unreasonable under the circumstances, the Court concludes that Officer Pfiefer's use of force amounted to a constitutional violation under the first prong of qualified immunity. *See Blackenhorn*, 485 F.3d at 480.

### b. Clearly Established

Having found that there is a triable question of fact regarding the constitutional violation on the excessive force claim, the Court must determine whether that constitutional violation was clearly established on April 17, 2013. Considering the amount of force that Redmond contends Officer Pfiefer used to arrest her, the Court concludes that it was clearly established that the use of force was excessive, and a reasonable officer would have known that the conduct violated the Fourth Amendment. *See Blankenhorn*, 485 F.3d at 481 ("In assessing the state of the law at the time of Blankenhorn's arrest, we need look no further than *Graham*'s holding that force is only justified when there is a need for force.").

At the outset, the Court agrees with Defendants that Redmond mischaracterizes the law on qualified immunity. There is no subjective component of the qualified immunity analysis, which asks whether clearly established law proscribed the officers' conduct at the time of the alleged violation. Redmond's legal analysis on the second prong of qualified immunity is therefore inaccurate and unhelpful. *See* Opp'n at 12-13. Nevertheless, the Court concludes that granting summary judgment on the grounds of qualified immunity is improper because there are several factual disputes as to whether Redmond was threatening to the officers or resisting arrest. Defendants concede that qualified immunity is only a legal question to the extent that the underlying facts are undisputed. Reply at 8. Meanwhile, they ignore that the facts regarding Officer Pfiefer's use of force on Redmond are entirely disputed.

As recounted above, Redmond testifies that when she got out of the car she took only "two steps" toward the officers when Officer Pfiefer came charging at her as she was already backtracking. Redmond Depo. 103:14-17. Officer Pfiefer then tried to grab her arm, and stomped on her foot. *Id.* 104:1-105:10. He held her in place with his foot as he "pulled back his right arm and punched me on the right side of my face." *Id.* 106:2-3. Redmond then fell to a crouched position, and Officer Pfiefer pulled her back up by her hair. *Id.* 109:20-110:12. He then violently wrenched her arm until she heard a pop and went limp, before he shoved her to the ground and handcuffed her. *Id.* 113:9-13. Crediting Redmond's testimony that she was backing away from the officers and did not resist arrest, no reasonable officer could believe that Officer Pfiefer's

1    actions were permitted under the Fourth Amendment. Thus, Officer Pfiefer violated Redmond's

2    clearly established right to be free from excessive force.

3            The Court acknowledges that the Supreme Court has repeatedly admonished courts to

4    consider clearly established constitutional violations as it relates to the particular circumstances of

5    the case, and must avoid defining it "at a high level of generality." *See White v. Pauly*, 137 S.Ct.

6    548, 551-52 (2017). Further, the Ninth Circuit has recently emphasized that the plaintiff has the

7    burden under the second prong of qualified immunity to point to case law indicating that the right

8    allegedly violated was clearly established. "Except in the rare case of an 'obvious' instance of

9    constitutional misconduct…Plaintiffs must *identify a case* where an officer acting under similar

10   circumstances as [Officer Pfiefer] was held to have violated the Fourth Amendment." *Sharp v.*

11   *County of Orange*, No. 15-56146, 2017 WL 4126947, at *7 (9th Cir. Sept. 19, 2017) (emphasis in

12   original) (quoting *White v. Pauly*, 137 S.Ct. at 552). The preexisting law identified must also be

13   "controlling—from the Ninth Circuit or Supreme Court—or otherwise be embraced by a

14   consensus of courts outside the relevant jurisdiction." *Id.* (internal citation and quotation omitted).

15           Defendants argue that Redmond fails to point to case law establishing that police officers

16   cannot hit a suspect who, despite commands, advances on officers who are trying to subdue

17   another person, especially after the suspect has demonstrated non-compliance, and where a crowd

18   threatens the safety of the officers. *See* Mot. at 15. Again, this characterization of the factual

19   circumstances is disputed. Redmond testifies that she was "backtracking" rather than advancing

20   on the officers, and that she did not hear Officer Pfiefer say anything other than "you're under

21   arrest," before he resorted to force. Redmond Depo. 105:7. By Redmond's account, she was not

22   actively resisting arrest. Redmond does not have the burden on summary judgment under the

23   second prong of qualified immunity to point to case law directly on point to *Officer Pfiefer's*

24   version of the facts.

25           Contrary to Defendants' characterization, the relevant question is not whether a police

26   officer's use of striking force on an actively resistive and threatening suspect constitutes excessive

27   force. Rather, the question presented by Defendants' motion is whether the law clearly established

28   that a reasonable officer in the alleged circumstances could not charge at the driver of a vehicle

34

who had gotten out of the car to record an incident with another occupant of the vehicle, who was backtracking away as instructed, and proceed to grab her, stomp on her foot to hold her in place, punch her in the face, pull her up by her hair, wrench her arm violently, shove her to the ground, and handcuff her. For good reason, Defendants do not argue that Redmond's right to be free from *this* amount of force was not clearly established.

The Court finds that Redmond's constitutional right to be free from the amount of force according to her version of events was clearly established by *Graham*, and again by *Blankenhorn* and *Young*, all of which are controlling cases that are discussed at length above. Long before 2013, these cases made clear to a reasonable officer that using force (including punching) against a suspect who did not commit a serious crime, did not pose a threat, and did not resist arrest or attempt to flee is objectively unreasonable under the Fourth Amendment. *See Young*, 655 F.3d at 1167-68 (holding that "it is rarely necessary, if ever, for a police officer to employ substantial force without warning against an individual who is suspected only of minor offenses, is not resisting arrest, and, most important, does not pose any apparent threat to officer of public safety.").

Viewing the facts in the light most favorable to Redmond, the Court finds that the state of the law was clearly established such that a reasonable officer under the circumstances would be on notice that the amount of force used to arrest Redmond was unconstitutional. As such, Officer Pfiefer is not entitled to qualified immunity and Defendants' motion for summary judgment on the excessive force claim against Officer Pfiefer is DENIED.

### 3. Unlawful Arrest

Redmond also seeks to hold a number of officers liable for subjecting her to an unlawful arrest in violation of the Fourth Amendment.[4] Because the undisputed facts make clear that

---

[4] For the avoidance of doubt, the false arrest inquiry is distinct from the excessive force analysis conducted above. *See Blankenhorn v. City of Orange*, 485 F.3d 463, 477 (9th Cir. 2007) ("Because the excessive force and false arrest factual inquiries are distinct, establishing a lack of probable cause to make an arrest does not establish an excessive force claim, and vice-versa.").

Officer Pfiefer is the only officer who made the decision to arrest Redmond, the unlawful arrest claim against him is analyzed separately from the claims against the other officers. For the following reasons, Defendants' motion for summary judgment on the unlawful arrest claim against Officer Pfiefer is DENIED. The motion is GRANTED as to the unlawful arrest claim against the remaining officers.

### a.        Officer Pfiefer

A claim for unlawful arrest may arise under § 1983, "provided the arrest was without probable cause or other justification." *Dubner v. Cnty. of San Francisco*, 266 F.3d 959, 964 (9th Cir. 2001). "Probable cause exists when the facts and circumstances within the officer's knowledge are sufficient to cause a reasonably prudent person to believe that a crime has been committed." *Lassiter v. City of Bremerton,* 556 F.3d 1049, 1053 (9th Cir. 2009). "The determination whether there was probable cause is based upon the information the officer had at the time of making the arrest. It is essential to avoid hindsight analysis, *i.e.*, to consider additional facts that became known only after the arrest was made." *John v. City of El Monte*, 515 F.3d 936, 940 (9th Cir. 2008) (citations omitted).

Defendants argue that it is undisputed that Officer Pfiefer had probable cause to arrest Redmond for a violation of California Penal Code § 148 when she refused to exit the vehicle and later, when she refused to back up, in contravention of his commands. *See* Mot. at 18. Section 148 criminalizes "willfully resisting, delaying, or obstructing a peace officer" in the lawful performance of his or her duties. *See Smith v. City of Hemet*, 394 F.3d 689, 693 (9th Cir. 2005); Cal. Penal Code § 148 (West). According to Defendants, because officers are authorized to order a vehicle's occupants to exit the vehicle following a stop for a traffic infraction, Officer Pfiefer was authorized to order Redmond out of the car upon identifying the littering violation by Evans. *See* Mot. at 18. Defendants argue that Officer Pfiefer's command that Redmond get out of the car was further justified by the additional safety concerns due to Evans rolling up his window and waving around the box cutter. *Id*.

Officer Pfiefer testifies that he developed probable cause to arrest Redmond when he told her to open the door to her vehicle and she responded: "No." *See* Pfiefer Depo. 116:20-24. At that

point, she became "arrestable" for a violation of § 148 because she was "refusing to exit the vehicle to allow us to take Evans into custody as well as try to prevent injury to other officers." *Id*. 117:1-22. Once Redmond exited the vehicle, Officer Pfiefer testifies that he told her to "back up" as Redmond was advancing toward him. *Id*. 125:9-11. According to Officer Pfiefer, she responded with profanity and continued to move toward the officers "with her arms outstretched" so he gave her arrest commands and ultimately grabbed her left wrist and arrested her. *Id*. 125:22-126:16. At that point, Redmond was under arrest for both not following his commands to exit the vehicle, and not following his commands to back up once she exited the vehicle. *Id*. 126:22-25.

As discussed at length above, Redmond disputes Officer Pfiefer's account of the events preceding her arrest. In particular, Redmond states in her sworn deposition testimony that she only took two steps out of the car before she immediately started "backtracking." Redmond Depo. 103:14-17. Her testimony that Officer Pfiefer was "charging" toward her as soon as she got out of the car contradicts his testimony that he only arrested her after she refused his commands. *Id*. 104:1-13. Redmond further testifies that the only thing she heard Officer Pfiefer say before arresting her was "you're under arrest." *Id*. 105:5-10.

Defendants do not address these factual disputes about the events preceding Redmond's arrest, but again ask the Court to credit Officer Pfiefer's account. The Court concludes that a reasonable jury could credit Redmond's testimony and conclude that Officer Pfiefer did not have probable cause to arrest her. In particular, Redmond's testimony could support a finding that Officer Pfiefer was already charging at her to arrest her as soon as she got out of the car, before he gave her a chance to respond to any arrest commands such as to put her hands behind her back. *See People v. Quiroga*, 16 Cal. App. 4th 961, 966 (1993) ("[I]t surely cannot be supposed that Penal Code section 148 criminalizes a person's failure to respond with alacrity to police orders."). Moreover, Redmond unequivocally testifies that she was "backtracking" as Officer Pfiefer arrested her, undermining his testimony that she refused his commands to back up. Unlike the plaintiff in *Browning v. Pend Oreille Cty. Sheriff's Dep't*, the case relied on by Defendants, it is disputed in this case whether Redmond "did not cooperate, responded with profanity, [and] engaged in aggressive and threatening behavior toward the arresting officer." 442 F. App'x 310,

312 (9th Cir. 2011). These factual disputes preclude summary judgment on the false arrest claim against Officer Pfiefer.

Defendants raise qualified immunity on the false arrest claim for the first time in their reply brief. *See* Reply at 9-10. While the Court need not address this argument, Officer Pfiefer is not entitled to qualified immunity on this claim. As explained above, qualified immunity is not proper when there are disputed facts that are material to the qualified immunity analysis. "The determination of whether a reasonable officer could have believed his conduct was lawful is a determination of law that can be decided on summary judgment only if the material facts are undisputed." *LaLonde v. Cnty. of Riverside,* 204 F.3d 947, 953 (9th Cir.2000) (citing *Act Up!/Portland v. Bagley,* 988 F.2d 868, 873 (9th Cir.1993)). The Ninth Circuit has made clear that "when [qualified immunity] depends on genuinely disputed issues of material fact, the court must submit the fact-related issues to the jury." *Ortega v. O'Connor,* 146 F.3d 1149, 1154 (9th Cir. 1998); *see also Torres v. City of Los Angeles,* 548 F.3d 1197, 1211 (9th Cir. 2008) (noting that where "historical facts material to the qualified immunity determination are in dispute," a jury must decide those facts).

In light of the disputed facts regarding Redmond's actions prior to her arrest, qualified immunity on the false arrest claim as to Officer Pfiefer is denied. *Accord Warren v. Marcus*, 78 F. Supp. 3d 1228, 1244 (N.D. Cal. 2015). Defendants' motion for summary judgment on the false arrest claim against Officer Pfiefer is DENIED.

### b. Remaining Officers

The Court agrees with Defendants that the remaining officers Diep, Blackerby, and Hoskin are entitled to summary judgment on the false arrest claim because it is undisputed that they "had nothing to do with the decision to arrest" Redmond. *See* Mot. at 18. Diep and Blackerby were completely engaged with Evans, and Hoskin did not arrive at the scene until Redmond was already under arrest. Indeed, Redmond does not even discuss the liability of any officer other than Officer Pfiefer in her opposition regarding the false arrest claim. *See generally*, ECF 134. Therefore, Defendants' motion for summary judgment on the false arrest claim against all remaining officers, other than Officer Pfiefer, is GRANTED. *See, e.g.*, *Browning*, 442 F. App'x at

312 (holding that responding officers were "entitled to summary judgment because they were not present and did not participate in the arrest.") (citing *Hopkins v. Bonvicino,* 573 F.3d 752, 774 (9th Cir.2009)).

### 4. Unlawful Search of Redmond's Person

With respect to Redmond's claim for unlawful search of her person in violation of the Fourth Amendment, she again names a wide swath of officers. *See* 4AC ¶¶ 106-116. However, Officer Hoskin was the only officer who Redmond alleges to have conducted the pat-down search of her person after Officer Pfiefer placed her under arrest. Redmond does not cite to any authority to support her position that all of the officers are directly liable for the search of the person claim.[5]

Defendants argue that Officer Hoskin's search of Redmond's person was a lawful search incident to arrest, and that the scope of the pat down was constitutionally permissible. *See* Mot. at 20. Moreover, it is undisputed that Officer Hoskin arrived at the scene *after* the events leading up to and including Redmond's arrest had occurred, and Hoskin only conducted the search after other officers confirmed to her that Redmond was under arrest. *See* ECF 130-1, Exh. F ("Hoskin Depo.") 90:4-7.

The heart of Redmond's claim against Officer Hoskin is that the search of Redmond's person is so related to her unlawful arrest claim that the unlawful search claim must also be sent to the jury. *See* Opp'n at 18-19.[6] As discussed above, the Court agrees that the question of whether Officer Pfiefer had probable cause to arrest Redmond for a violation of § 148 rests on disputed issues of material fact. However, Redmond cites to no case law in support of her position that if an arrest is unconstitutional, a search incident to that arrest—even if conducted by an officer who was not present during the arrest—is likewise unconstitutional.

In the absence of any authority from Redmond, the Court finds persuasive Defendants' argument that officers are permitted to rely on the information supplied by their fellow law

---

[5] Redmond's claims against the Supervisors and the City itself on this cause of action are addressed separately below.

[6] Redmond did not argue, either in her opposition or at the hearing on the motion for summary judgment, that Officer Hoskin's alleged exposure of Redmond's midriff during the search was a constitutional violation. 4AC ¶¶ 51, 102, 118. The Court agrees with Defendants that it is undisputed that the alleged scope of Officer Hoskin's pat down was reasonable.

United States District Court
Northern District of California

enforcement officers, even if that information later turns out to be wrong. *See Choi v. Gaston*, 220

F.3d 1010, 1012 (9th Cir. 2000). This is because law enforcement requires division of labor and

shared knowledge in order to function effectively. *See United States v. Jensen*, 425 F.3d 698, 704

(9th Cir. 2005) ("The accepted practice of modern law enforcement is that an officer often makes

arrests at the direction of another law enforcement officer even though the arresting officer himself

lacks actual, personal knowledge of the facts supporting probable cause."). There is no suggestion

in the Fourth Amended Complaint or in the evidentiary record before the Court that Officer

Hoskin had anything other than an objectively reasonable belief that Redmond was properly

arrested by her fellow officers. Redmond points to no evidence that would call into question

Hoskin's good faith belief that Redmond was validly arrested before Hoskin arrived.

As to Officers Diep and Blackerby, neither had any role in the search nor is there any

evidence that they could have intervened. Instead, the evidence shows that they were completely

engaged with Evans. For the foregoing reasons, Defendants' motion for summary judgment is

GRANTED as to the search of person claim against all of the Officer Defendants.

### 5. Unlawful Search and Seizure of the Vehicle

Similarly, Redmond brings a claim under § 1983 against Officers Pfiefer, Diep, Blackerby,

Perrier, Galea and the City itself for an unlawful search of her vehicle after she was arrested. *See*

4AC ¶¶ 121-129. Defendants move for summary judgment on this claim on the grounds that the

officers properly impounded the vehicle after Redmond's arrest, and any search of the vehicle

lawfully flowed from the impoundment.

Redmond primarily argues that under the line of cases stemming from *Arizona v. Gant*, it

was unconstitutional for the officers to search her vehicle because she was not within reaching

distance of the vehicle and there was no reason to believe the vehicle contained any evidence

related to the crime of arrest. 556 U.S. 332, 347 (2009). However, Redmond does not address

Defendants argument that under the community caretaking function, her vehicle was properly

impounded following her arrest. *See Jensen*, 425 F.3d at 706 ("Once the arrest was made, the

doctrine allowed law enforcement officers to seize and remove any vehicle which may impede

traffic, threaten public safety, or be subject to vandalism.") Redmond's entire argument in her

opposition appears to be that the vehicle was improperly "searched," and she does not specify if she challenges any specific items that were seized from the vehicle as a result of a search. *See* Opp'n at 19.

In the record before the Court, it is undisputed that Redmond's vehicle was located in a crowded area of Roosevelt Park and both occupants of the vehicle, including its owner, had been arrested and were being transported to jail. The Court finds that the impoundment and search of Redmond's vehicle was reasonable under the Fourth Amendment. Community caretaking is an exception to the warrant requirement by which "police officers may impound vehicles that 'jeopardize public safety and the efficient movement of vehicular traffic.' " *Miranda v. City of Cornelius*, 429 F.3d 858, 864 (9th Cir. 2005) (quoting *South Dakota v. Opperman*, 428 U.S. 364, 368–69, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976)). This exception is a distinct exception to the warrant requirement from the line of cases cited by Redmond, and she does not address Defendants' arguments under this exception. Ultimately, Redmond provides the Court with no evidence to create a triable issue of fact as to whether her vehicle was unreasonably impounded and illegally searched under the community caretaking doctrine and the inventory exception to the Fourth Amendment. Defendants' motion for summary judgment as to the unlawful search of the vehicle is therefore GRANTED.

### C.   Supervisory Liability as to Sergeants Perrier and Galea

With respect to all of the constitutional claims discussed above, Redmond also brings § 1983 claims against Sergeants Perrier and Galea under a theory of supervisory liability. *See generally* 4AC ¶¶ 85, 86, 92, 98, 104, 110, 116, 125, 126. Redmond's theory is that Sergeants Perrier and Galea are liable for ratifying and condoning their officers' unconstitutional conduct in this case. Defendants move for summary judgment on the ground that Redmond can point to no evidence to support a claim that the supervisors were deliberately indifferent to any of the allegedly unconstitutional actions of their subordinates.

The Ninth Circuit has "long permitted plaintiffs to hold supervisors individually liable in § 1983 suits when culpable action, or inaction, is directly attributed to them." *Starr v. Baca*, 652 F.3d 1202, 1205–06 (9th Cir. 2011). However, vicarious liability is inapplicable to § 1983 actions

and thus "Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior." Ashcroft v. Iqbal,* 556 U.S. 662, 676 (2009). In this sense, the Supreme Court has indicated that the term "supervisory liability" in the context of § 1983 actions is actually a "misnomer." *Id.* at 677. The Supreme Court held in *Iqbal* that supervisors cannot be held liable for unconstitutional discrimination based on the supervisors' "knowledge and acquiescence in their subordinates' use of discriminatory criteria to make classification decisions among detainees.'" *Id.* Thus, when a supervisor does not directly participate in the constitutional violation, that supervisor cannot be liable under § 1983 unless the plaintiff shows that the supervisor, through his "own individual actions, has violated the Constitution." *Id.* at 676.

Redmond argues that in order to be held liable, the supervisor need not be "directly and personally involved in the same way as are the individual officers who are on the scene inflicting constitutional injury." *Larez v. City of Los Angeles,* 946 F.2d 630, 645 (9th Cir. 1991). Rather, the supervisor's participation could include his "own culpable action or inaction in the training, supervision, or control of his subordinates," "his acquiescence in the constitutional deprivations of which the complaint is made," or "conduct that showed a reckless or callous indifference to the rights of others." *Id.* at 646; *see also Preschooler II v. Davis,* 479 F.3d 1175, 1183 (9th Cir. 2007). However, Redmond does not address that, in light of *Iqbal,* it is questionable whether the Ninth Circuit cases holding that a supervisor can be liable for his acquiescence in a constitutional deprivation is still good law. Since *Iqbal* came down, the Ninth Circuit has concluded that, at least in cases where the applicable standard is deliberate indifference, a plaintiff may still state a claim for supervisory liability based upon the "supervisor's knowledge of and acquiescence in unconstitutional conduct by his or her subordinates." *Starr*, 652 F.3d at 1207.

Additionally, a supervisor may be liable under § 1983 if a plaintiff can show that "in light of the duties assigned to specific officers or employees, the need for more or different training is obvious, and the inadequacy so likely to result in violations of constitutional rights, that the policy-makers ... can reasonably be said to have been deliberately indifferent to the need." *Clement v. Gomez,* 298 F.3d 898, 905 (9th Cir. 2002); *see also Redman v. County of San Diego,*

942 F.2d 1435, 1446 (9th Cir. 1991) (en banc) ("Supervisory liability exists even without overt personal participation in the offensive act if supervisory officials implement a policy so deficient that the policy itself is a repudiation of constitutional rights and is the moving force of a constitutional violation").

As explained further below, Redmond does not dispute that Sergeants Perrier and Galea were not present during Redmond's arrest. The Court agrees that a supervisor need not be physically present when the constitutional injury occurred to be held liable. *See Starr*, 652 F.3d at 1205–06. However, merely taking the side of their officers and ignoring the plaintiff's complaint does not raise a triable issue of fact that the supervisors were deliberately indifferent to constitutional violations by their subordinates.

Defendants argue that, even viewing the evidence in the light most favorable to Redmond, Redmond's claims against Sergeants Perrier and Galea under a theory of supervisory liability must fail. According to Defendants, there is no evidence that Sergeants Perrier or Galea were deliberately indifferent to any allegedly unconstitutional acts by their officers. Mot. 16. Moreover, there is no evidence that the supervisors improperly trained their subordinates. In fact, evidence in the record demonstrates that the individual officers were trained at the Police Academy, and participated in a training course specifically for downtown enforcement. Galea Depo. 51:10-13; 104:17-106:10. This training specifically included a discussion of citizens' First Amendment rights to record police officers. *Id.* ("So I reminded the officers that they were going to be on camera, that it was not illegal to be able to record, but they have to – with the understanding they have to do it from a safe distance, that they're not part of the fight, and that they're not doing something that either would cause them to get arrested or if they were – had already done something to get arrested.")

Defendants have met their burden on summary judgment with respect to constitutional claims against Sergeants Perrier and Galea based on supervisory liability. Once the moving party meets its initial burden on summary judgment, "[t]he non-moving party must show more than the mere existence of a scintilla of evidence." *In re Oracle Corporation Securities Litigation,* 627 F.3d 376, 387 (9th Cir.2010) (citing *Liberty Lobby,* 477 U.S. at 252). "In fact, the non-moving

party must come forth with evidence from which a jury could reasonably render a verdict in the non-moving party's favor." *Id.* (citing *Liberty Lobby,* 477 U.S. at 252). If Redmond fails to make this showing on her claims against the supervisors, Defendants are entitled to judgment as a matter of law. *See Celotex Corp.*, 477 U.S. at 323.

To carry her burden, Redmond must point to evidence that Sergeants Perrier and Galea were deliberately indifferent to the constitutional violations of Officer Pfiefer in order to demonstrate that a triable issue of fact exists with respect to her § 1983 claims against the supervisors.[7] Redmond points to her own deposition testimony, as well as testimony from the supervisors, and argues that the evidence supports more than a mere failure to discipline Officer Pfiefer for his conduct, and amounts to deliberate indifference of constitutional violations. *See* Opp'n at 14-15.

The evidence reveals that Sergeant Perrier was a patrol supervisor who did not directly supervise Officers Pfiefer, Diep, and Blackerby. Perrier Depo. 53:14-54:13. On April 17, 2013, Perrier was on patrol when he responded to an emergency request for assistance from an officer in Roosevelt Park. *Id.* 66:1-67:5. Redmond testifies that she was already in handcuffs in the back of the police car when Sergeant Perrier arrived on the scene, and recalls that he walked over to her to say: "you assaulted *my* officer." Redmond Depo. 65:16-66:5 (emphasis added). Redmond argues that this statement, combined with Sergeant Perrier's failure to properly investigate the incident when he arrived, makes him liable for the constitutional violations committed against her. Sergeant Perrier did not ask why the incident had escalated, what crime Redmond was alleged to have committed, or otherwise attempt to determine whether force was justified. Perrier Depo 78:1-10. Rather, after Officer Pfiefer explained the situation to him, Officer Perrier called his lieutenant to confirm that it was a "good detention" and probable cause existed to arrest Redmond and Evans. *Id.* 80:22-81:24; 82:18-83:5. Redmond argues that this evidence creates a triable issue with respect to whether Sergeant Perrier was deliberately indifferent to Officer Pfiefer's violation of Redmond's constitutional rights because Perrier's actions indicate that he approved of the

---

[7] As determined above, the only constitutional violations under a theory of direct liability that remain are against Officer Pfiefer.

unconstitutional conduct.

As for Sergeant Galea, who was the immediate supervisor of Officers Pfiefer, Diep, and Blackerby, he was never on the scene in Roosevelt Park that day. However, Sergeant Galea spoke to Redmond back at the station and heard accounts of the events from Redmond as well as Officer Pfiefer. Redmond contends that Sergeant Galea has supervisory liability for the constitutional violations because he sent the officers to Roosevelt Park to patrol for gang activity, and then condoned Officer Pfiefer's actions toward Redmond, including punching her in the face, without further inquiry into whether the use of force was reasonable. *See* Opp'n at 9 (citing Galea Depo. 120:14-130:21). Redmond takes issue with Sergeant Galea's acknowledgment that he "condoned" Officer Pfiefer's decision to hit her in the face. Galea Depo. 120:14-121:11. Galea further testified that in his experience, suspects generally lie to police officers to get themselves out of trouble, but the police never lie. *Id*. 124:24-125:7.

Redmond argues that this evidence, as well as the supervisors' failure to adequately train the officers about citizens' First Amendment rights to record police activity, raise a triable issue of fact on the constitutional claims against Sergeants Perrier and Galea. *Id*. at 10. She contends that a reasonable juror could hear this evidence and conclude that Sergeants Perrier and Galea were deliberately indifferent to Officer Pfiefer's alleged constitutional violations. *Id*. 15. The Court disagrees, and finds that Redmond fails to submit sufficient evidence to support her claims against Sergeants Perrier and Galea. A triable issue of deliberate indifference is not raised when there is only evidence that supervisors believed their subordinate officers' version of events over the suspect's version. *See Coon v. Ledbetter*, 780 F.2d 1158, 1162 (5th Cir. 1986); *Jones v. County of Sacramento*, 2010 WL 2843409, at *7 (E.D. Cal. 2010) (holding that a "supervisor's isolated and subsequent ratification of an officer's conduct…can never be sufficient to show that the supervisor caused the officer's conduct.")

Other than statements by the Sergeants indicating that they believed their officers' version of events over hers, Redmond's allegations are entirely lacking any evidentiary support. *See FTC v. Publ'g Clearing House*, 104 F.3d 1168, 1171 (9th Cir. 1997) ("A conclusory, self-serving affidavit, lacking detailed facts and any supporting evidence, is insufficient to create a genuine

issue of material fact.").  Redmond offers no evidence to raise a triable issue of fact that Sergeants Perrier or Galea knew or should have known about Officer Pfiefer's allegedly unconstitutional acts, and concedes that they were not present at the time the unconstitutional conduct occurred. Although a supervisor need not be physically present in order to be held liable for constitutional violations, Redmond must still offer evidence—such as the supervisors' awareness of pre-incident conduct by Officer Pfiefer that might alert them to his unconstitutional behavior—in order to raise a triable issue of fact that the supervisors were deliberately indifferent to it.  Redmond has not done so.

The record is further devoid of any evidence to raise a triable issue of fact as to whether Sergeants Perrier and Galea's conduct was the "moving force" behind Officer Pfiefer's alleged constitutional violations. *See Starr v. Baca*, 652 F.3d 1202, 1208 (9th Cir. 2011) (finding that a jury reviewing a claim for deliberate indifference against a supervisor must be able to find that the defendant "knew or reasonably should have known" of the constitutional violation and "acquiesced in a deficient policy that was a moving force behind" the plaintiff's injury).  The supervisors' statements that they believed their officers over Redmond in this one instance cannot be generalized to create a triable issue of fact that Sergeants Perrier and Galea were deliberately indifferent to the alleged constitutional violations.

Accordingly, Defendants' motion for summary judgment is GRANTED as to Sergeants Perrier and Galea on all of Redmond's constitutional claims above.

### D.    *Monell* Claim against the City

Defendants also seek summary judgment on Redmond's *Monell* claim against the City. Redmond seeks to hold the City liable for its policy or practice of violating the First and Fourth Amendment rights of citizens. *See generally* 4AC ¶¶ 87, 91, 99, 111, 127.  Defendants contend that Redmond cannot establish a deprivation of any constitutional right and that she lacks "any proof whatsoever" of a City policy that gave rise to a deprivation of any constitutional right.  Mot. at 11.  At oral argument, Redmond submitted on the papers as to the *Monell* claims.  The Court has reviewed the record and agrees with Defendants that there is a complete absence of evidence with respect to any policy giving rise to a deprivation of a constitutional right under the First or

Fourth Amendment.

"A government entity may not be held liable under 42 U.S.C. § 1983, unless a policy, practice, or custom of the entity can be shown to be a moving force behind a violation of constitutional rights." *Dougherty v. City of Covina*, 654 F.3d 892, 900 (9th Cir. 2011) (citing *Monell v. Dep't of Soc. Servs. of the City of New York*, 436 U.S. 658 (1978). "In order to establish liability for governmental entities under *Monell*, a plaintiff must prove '(1) that [the plaintiff] possessed a constitutional right of which [s]he was deprived; (2) that the municipality had a policy; (3) that this policy amounts to deliberate indifference to the plaintiff's constitutional right; and, (4) that the policy is the moving force behind the constitutional violation.'" *Id.* (quoting *Plumeau v. Sch. Dist. No. 40 Cnty. of Yamhill*, 130 F.3d 432, 438 (9th Cir. 1997)) (alterations in original).

Alternatively, "[a] municipality may be held liable for a constitutional violation if a final policymaker ratifies a subordinate's actions." *Lytle v. Carl*, 382 F.3d 978, 987 (9th Cir. 2004). "To show ratification, a plaintiff must show that the authorized policymakers approve a subordinate's decision and the basis for it." *Id.* (internal quotation marks and citation omitted). The policymaker must have actual knowledge of the constitutional violation and affirmatively approve of it – a failure to overrule a subordinate's actions is insufficient to support a § 1983 claim. *Id.*

Defendants argue that there is no evidence of an unconstitutional policy by the City that amounts to deliberate indifference. Redmond's boilerplate allegations in the Fourth Amended Complaint that the City has "patterns, policies, procedures and customary practices that routinely violate the constitutional rights of the public" in the manner of the challenged conduct is completely unsupported by the evidence in the record. *See* 4AC ¶¶ 87, 91, 99, 111, 127. Moreover, evidence of the alleged unconstitutional conduct by the individual officers is not sufficient to establish that the City had an unconstitutional policy. "A plaintiff cannot demonstrate the existence of a municipal policy or custom based solely on a single occurrence of unconstitutional action by a non-policymaking employee." *McDade v. West*, 223 F.3d 1135, 1141 (9th Cir. 2000) (quoting *Davis v. City of Ellensburg,* 869 F.2d 1230, 1233-34 (9th Cir.1989).

United States District Court
Northern District of California

"Only if a plaintiff shows that his injury resulted from a 'permanent and well settled' practice may liability attach for injury resulting from a local government custom." *Thompson v. City of Los Angeles,* 885 F.2d 1439, 1444 (9th Cir.1989).

Because Defendants have established an absence of evidence to support Redmond's *Monell* claims, the burden shifts to Redmond "to designate specific facts demonstrating the existence of genuine issues for trial." *Oracle*, 627 F.3d at 387. Redmond offers no evidence that the City maintained unconstitutional policies as alleged in the Fourth Amended Complaint. Redmond contends in her opposition brief that "the facts show the City has a known custom within the police department to disregard citizens' constitutional rights and use pretense in lieu of actual probable cause to affect an arrest." Opp'n at 16. Redmond further contends that the City, through its supervisors, was deliberately indifferent to the unconstitutional conduct of its officers. *Id*. Yet Redmond ignores the "stringent standard" required to prove deliberate indifference, and points to no evidence of such customs, policies, or failure to train that would support *Monell* liability for any First or Fourth Amendment violations in this case. As such, there is no evidence that the City failed to train its officers as alleged by Redmond, or even that any failure to do so amounted to deliberate indifference.

Instead, Redmond relies only on the response of the individual officers and supervisors in this instance, arguing that their behavior in this case represents a "systemic approach that is customary in the department." *Id*. 17. Evidence of an unconstitutional response in a single incident is insufficient to defeat summary judgment on a *Monell* claim. *See McDade*, 223 F.3d at 1141; *see also MacEachern v. City of Manhattan Beach*, 623 F. Supp. 2d 1092, 1106 (C.D. Cal. 2009) (collecting cases). At oral argument, the Court expressed its view that there did not seem to be evidence in the record of a policy or practice to support the *Monell* claim. Redmond's counsel offered no additional argument and submitted on the papers as to the *Monell* claim. Accordingly, Redmond has failed to meet her burden.

For these reasons, Defendants' motion for summary judgment on the § 1983 claims against the City is GRANTED on all of the constitutional claims above.

48

**E.     State Law Claims**

Defendants also move for summary judgment on Redmond's various state law claims, including her claim for a violation of Civil Code Section 52.1 (the "Bane Act."). In some instances, the parties concede that the state law analysis follows the constitutional analysis above. The Court rules on Defendants' motion for summary judgment as to the state law claims as follows:

**1.     Bane Act**

Redmond's Seventh Cause of Action alleges a violation of the Bane Act. 4AC ¶¶ 130-136. A defendant is liable under the Bane Act "if he or she interfered with or attempted to interfere with the plaintiff's constitutional rights by ... threats, intimidation, or coercion." *Shoyoye v. Cnty. of Los Angeles,* 203 Cal.App. 4th 947, 956 (2012); Cal. Civ.Code § 52.1(a). Although the Bane Act is analogous to § 1983, it is not tantamount to a § 1983 violation, and requires more than evidence of a violation of rights. *Bass v. City of Fremont,* No. C12–4943 TEH, 2013 WL 891090, at * 4 (N.D. Cal. Mar. 8, 2013); *see also Austin B. v. Escondido Union Sch. Dist.,* 149 Cal.App.4th 860, 883, 57 Cal.Rptr.3d 454 (2007) ("The essence of a Bane Act claim is that the defendant, by the specified improper means (i.e., "threats, intimidation or coercion"), tried to or did prevent the plaintiff from doing something he or she had the right to do under the law.").

Thus, a Bane Act claim requires "(1) interference with or attempted interference with a state or federal constitutional or legal right, and (2) the interference or attempted interference was by threats, intimidation, or coercion." *Allen v. City of Sacramento*, 234 Cal.App.4th 41, 67, 183 Cal.Rptr.3d 654 (2015). The California Court of Appeal recently clarified that the Bane Act "requires a showing of threatening conduct independent from the alleged interference or violation of a civil right." *Doe v. State*, 8 Cal. App. 5th 832, 842–43, 214 Cal. Rptr. 3d 391, 400 (Ct. App. 2017), review denied (June 14, 2017); *see also Allen*, 234 Cal.App.4th at 66 ("[W]e conclude a wrongful arrest or detention, without more, does not satisfy both elements of section 52.1.").

The theory of Redmond's Bane Act claim is closely connected to her First Amendment claim. *See* Opp'n at 20. She argues that Officer Pfiefer's excessive force and intimidation against her to prevent her from videotaping the events is sufficient to create a triable issue on the Bane Act

49

United States District Court
Northern District of California

claim. Defendants improperly ask the Court to consider the *officers'* version of the facts on this claim, and argue that because Redmond started "yelling at the officers" as soon as they arrived and the officers merely "reacted" to them, she cannot prove a Bane Act claim. *See* Mot. at 22-23.

The Court finds that triable issues of fact exist such that a reasonable jury could conclude that Officer Pfiefer's alleged conduct constituted a "threat, intimidation, or coercion" sufficient to sustain a Bane Act claim. As discussed above in connection with her First Amendment and excessive force claims, Redmond's testimony supports serious constitutional violations against Officer Pfiefer and likewise creates a triable issue as to whether there were any threats, intimidation, or coercion in connection with such constitutional violation.

Redmond also names Officers Diep and Blackerby on this claim, but offers absolutely no evidence to support a claim for a violation of the Bane Act against them. As discussed above, the undisputed evidence shows that Officers Diep and Blackerby were fully engaged with Evans. As for Sergeants Perrier and Galea, there is no evidence that either one was directly involved in the events leading up to Redmond's arrest. It is undisputed that Sergeant Perrier arrived at Roosevelt Park after the incident had concluded and Redmond was already in handcuffs in the back of the police car, and Sergeant Galea was never at the scene. Therefore, Redmond cannot support a Bane Act claim against these officers under a theory of direct liability.

The Parties do not address whether supervisory or entity liability exists under the Bane Act, even though the Fourth Amended Complaint alleges a Bane Act claim against Sergeants Perrier, Galea and the City. *See* 4AC ¶¶ 130-136. The Court assumes that, as with the constitutional violations, Redmond seeks to hold Sergeants Perrier and Galea liable because they supervised Officer Pfiefer who allegedly used threats, intimidation, or coercion against her. However, Redmond does not explicitly make this argument and thus does not offer any authority to support the imposition of supervisory liability under the Bane Act. The Court is unable to find any cases supporting such liability, and agrees with those federal district courts that have declined to extend supervisory liability to the Bane Act despite its common reference as the "state equivalent" to § 1983. *See, e.g.*, *Sanchez v. City of Fresno*, 914 F. Supp. 2d 1079, 1119 (E.D. Cal.

2012) (holding that "no case has actually applied supervisor liability a Bane Act claim and this federal Court is loathe to expand the reach of Bane Act liability.")

The Parties also do not address the City's exposure under the Bane Act, including whether the City should be considered a "person" under the statute. The Court notes, however, that because Redmond has raised a triable issue of fact regarding Officer Pfiefer's liability, the City can also be held liable for a Bane Act violation under a theory of respondeat superior. *See Cameron v. Craig*, 713 F.3d 1012, 1023 (9th Cir. 2013) (noting with respect to a Bane Act claim that state law imposes liability on counties under the doctrine of respondeat superior). The Ninth Circuit made clear in *Cameron* that the result is different with respect to entity liability under the Bane Act than it is under § 1983, because "California has rejected the *Monell* rule." 713 F.3d at 1023 (citing Cal. Gov't Code § 815.2). Rather, state law imposes liability on counties under the doctrine of respondeat superior, and "grants immunity to counties only where the public employee would also be immune." *Id.* at 1023-24.

Because they do not address the Bane Act claim against the City in their motion for summary judgment, Defendants also do not assert any state statutory immunities on this claim. The Court therefore concludes that liability could extend to the City should Redmond prevail on her Bane Act claim against Officer Pfiefer. *Id.*; *see also M.H. v. Cty. of Alameda*, 90 F. Supp. 3d 889, 897 (N.D. Cal. 2013) ("Because Plaintiffs adequately state a Bane Act claim with respect to Defendant Sancho, her liability also gives rise to respondeat superior liability with respect to Defendant Corizon Health under traditional California common law principles."); *Mary M. v. City of Los Angeles*, 54 Cal. 3d 202, 215 (1991) ("[A] governmental entity can be held vicariously liable when a police officer acting in the course and scope of employment uses excessive force or engages in assaultive conduct.").

For the foregoing reasons, the Court DENIES Defendants' motion for summary judgment on the Bane Act claim against Officer Pfiefer and the City. Defendants' motion for summary judgment on the Bane Act claim is GRANTED as to Diep, Blackerby, Perrier and Galea.

### 2. Battery

Redmond claims that Officers Pfiefer and Hoskin are liable for battery under state law for

their alleged offensive and unwanted physical contact with her.  The parties agree that "[b]attery is a state law tort counterpart to a 42 U.S.C. § 1983 excessive force claim." *J.P. ex rel. Balderas v. City of Porterville*, 801 F. Supp. 2d 965, 990 (E.D. Cal. 2011).

Because the Court finds that there is a triable issue of fact as to whether Officer Pfiefer used excessive force against Redmond in the course of her arrest, he is likewise not entitled to summary judgment on her battery claim.  Therefore, Defendants' motion for summary judgment on the battery claim against Officer Pfiefer is DENIED.

However, Redmond does not argue in her opposition that Officer Hoskin is liable for excessive force or battery in the context of her pat-down of Redmond after the arrest. *See* Opp'n at 21.  As discussed above, Redmond's unlawful search of person claim was based on her argument that the search was unlawful because the arrest was unlawful.  There is no evidence in the record that would allow a reasonable jury to conclude that Officer Hoskin is liable for battery.  Defendants' motion for summary judgment on the battery claim against Officer Hoskin is accordingly GRANTED.

### 3. False Arrest/False Imprisonment

Again, the parties concede that Redmond's state law false arrest/false imprisonment claim rises and falls with her constitutional false arrest claim. *See* Mot. at 23; Opp'n at 21.  Because the Court finds that a disputed issue of material fact exists as to whether Officer Pfiefer had probable cause to arrest Redmond, a triable issue likewise exists on Redmond's state law claim for false arrest/false imprisonment against Officer Pfiefer.  Defendants' motion for summary judgment on the state law false arrest/false imprisonment claim is therefore DENIED as to Officer Pfiefer.  Because Officers Diep, Blackerby, Perrier, Galea and Hoskin are entitled to summary judgment on the constitutional claim for false arrest, summary judgment is GRANTED as to these officers on the state law false arrest/false imprisonment claim.

### 4. Intentional Infliction of Emotional Distress

Although the above state law claims are identical to their federal counterparts, there is no analogy between a Fourth Amendment violation and a claim for intentional infliction of emotional distress.  Redmond alleges that Officers Pfiefer, Diep, Blackerby, Perrier and Galea are liable for

intentionally or recklessly causing Redmond severe emotional distress. *See* 4AC ¶¶ 137-140.

Under California law, the tort of intentional infliction requires Redmond to prove that Defendants engaged in extreme and outrageous conduct with the intention of causing severe emotional distress. *Potter v. Firestone Tire & Rubber Co.,* 6 Cal.4th 965, 1001 (1993). The requirement of "extreme and outrageous" conduct closely follows the "egregious and outrageous" standard for due process liability under the Fourteenth Amendment. *See Nelson v. City of Davis*, 709 F. Supp. 2d 978, 993 (E.D. Cal. 2010), aff'd, 685 F.3d 867 (9th Cir. 2012) (quoting *County of Sacramento v. Lewis,* 523 U.S. at 847, 118 S.Ct. 1708).

Redmond did not address her claim for intentional infliction of emotional distress in her opposition or at the hearing on the motion for summary judgment. The Court finds that the heightened standard for establishing an intentional infliction of emotional distress claim compared to a Fourth Amendment violation entitles all of the officers, including Officer Pfiefer, to summary judgment on this claim. Defendants' motion is therefore GRANTED as to Redmond's claim for intentional infliction of emotional distress against all officers.

### 5. Negligent Infliction of Emotional Distress

Finally, Defendants argue that no triable issue of fact exists with respect to Redmond's negligence claim. The Court disagrees, at least to the extent that Redmond alleges that Officer Pfiefer was negligent in the amount of force he used against her. Because there is a triable issue with respect to whether Officer Pfiefer used excessive force in arresting Redmond, there is likewise a triable issue regarding whether Officer Pfiefer was negligent. Defendants' motion for summary judgment on the negligent infliction of emotional distress claim is therefore DENIED as to Officer Pfiefer. Redmond also brings this claim against Officers Diep, Blackerby, Perrier, Galea and Hoskin. As discussed above, it is undisputed that these officers either acted reasonably, were engaged with Evans, or were not present at the time the challenged conduct took place. Defendants' motion for summary judgment on the negligence claim is therefore GRANTED as to the remaining officers.

### F. Equal Protection Claim

Finally, Redmond alleges that Officers Pfiefer, Diep, and Blackerby, as well as the City,

are liable for a violation of the Fourteenth Amendment's Equal Protection Clause for discriminating against her based on her race. 4AC ¶¶ 146-153.  Redmond contends that she and her boyfriend were racially profiled in Roosevelt Park on the day in question, and the officers only approached them because they are African American. *See* Opp'n at 22.  Redmond goes on to argue that investigating the crime of littering was a pretext to approach the vehicle occupied by the only African Americans in the park. *Id*.  Defendants argue that without evidence of a discriminatory effect or motive on behalf of the officers, the officers and the City are entitled to summary judgment on the equal protection claim. *See* Mot. at 24.

To prevail on an equal protection claim under the Fourteenth Amendment, Redmond must ultimately prove two elements: (1) that enforcement of the law had a discriminatory effect; and (2) that the police were motivated by a discriminatory purpose. *See Lacey v. Maricopa Cty.*, 693 F.3d 896, 920 (9th Cir. 2012) (citing *Rosenbaum v. City & Cnty. of S.F.,* 484 F.3d 1142, 1152 (9th Cir. 2007).  In order to prove a discriminatory effect, "the claimant must show that similarly situated individuals ... were not prosecuted." *United States v. Armstrong,* 517 U.S. 456, 465 (1996).  The standard for proving discriminatory effect "is a demanding one." *Lacey*, 693 F.3d at 920; *see also Freeman v. City of Santa Ana,* 68 F.3d 1180, 1187 (9th Cir.1995) ("[I]t is necessary to identify a 'similarly situated' class against which the plaintiff's class can be compared.")

As for the second element of an equal protection claim, discriminatory purpose, the Supreme Court has made clear that the Equal Protection Clause requires proof that the defendant acted with a discriminatory intent or motive. *See, e.g., Washington v. Davis,* 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976); *Village of Arlington Heights v. Metropolitan Housing Development \*1106 Corp.,* 429 U.S. 252 (1977).  To establish that Defendants were motivated by an improper purpose, Redmond must ultimately be able to show that the law was enforced against her "on the basis of an impermissible ground such as race, religion or exercise of ... constitutional rights." *Lacey*, 693 F.3d at 922 (citing *United States v. Kidder,* 869 F.2d 1328, 1336 (9th Cir. 1989).  On summary judgment, this means that a plaintiff "must provide evidence sufficient to permit a reasonable trier of fact to find by a preponderance of the evidence that the [treatment] was racially motivated." *Serrano v. Francis,* 345 F.3d 1071, 1082 (9th Cir. 2003) (quoting

54

*Bingham v. City of Manhattan Beach,* 341 F.3d 939, 949 (9th Cir.2003)). Moreover, "[e]vidence that the plaintiff and the defendant are of a different race or ethnicity combined with a disagreement as to the reasonableness of the defendant's conduct toward the plaintiff is alone insufficient to show a violation of the Equal Protection Clause." *Loharsingh v. City & Cty. of San Francisco*, 696 F. Supp. 2d 1080, 1106 (N.D. Cal. 2010) (citing *Bingham,* 341 F.3d at 949).

Defendants argue that they are entitled to summary judgment on the equal protection claim because Redmond has no evidence of discriminatory intent or motive. The officers testified that they approached Redmond's vehicle because they saw Evans throwing items out of the car. *See* Pfiefer Depo. 110:15-111:13. Moreover, there is no evidence that other people in Roosevelt Park were also littering or committing crimes that the officers ignored. Thus, Defendants argue that Redmond cannot establish discriminatory effect because she cannot show that similarly situated individuals were treated differently. Mot. at 24-25. Likewise, Defendants argue there is no evidence of discriminatory intent given the officers' legitimate reason to approach the vehicle.

In opposition to Defendants' summary judgment motion on the equal protection claim, Redmond points to her deposition testimony that other individuals, including an Asian woman, were also seated in their cars in the parking lot at the time the incident occurred. *See* Redmond Depo. 80:17-81:7. Officer Blackerby also testified that other individuals in the skate park had left when they heard that cops were in the area, leaving "open containers of beer everywhere," to try to get out before they got a ticket. *See* Blackerby Depo. 110:7-15. In addition, Officer Diep testified that their police unit was assigned to Roosevelt Park on the day in question due to reports of gang and drug activity. Diep Depo. 117:19-118:10. Based on these facts, Redmond argues that a reasonable jury could conclude that the littering violation was a pretext to approach the only car occupied by African Americans, and that Officers Pfiefer, Diep and Blackerby were selectively enforcing the law based on race.

The Court finds that no triable issue of material fact exists on Redmond's equal protection claim. The Court agrees with Defendants that Officer Blackerby's testimony that other individuals in the park left behind open containers as they fled in response to the officers' presence is not evidence of selective enforcement. Moreover, the sole fact that the officers were dispatched to

Roosevelt Park due to reports of "gang activity," could not lead a reasonable jury to conclude by a preponderance of the evidence that the officers acted with a discriminatory motive when they approached Redmond's vehicle to investigate the littering by Evans. Redmond's subjective belief that the officers' conduct was motivated by discriminatory intent is not sufficient to defeat summary judgment. *See Gomez v. City of Fremont*, 730 F.Supp.2d 1056, 1069 (N.D. Cal. 2010).

In *Bingham v. City of Manhattan Beach*, the Ninth Circuit affirmed the district court's dismissal of the plaintiff's equal protection claim on summary judgment because the plaintiff failed to produce "some tangible evidence in the record that tends to support his conclusion" that the defendant's conduct was racially motivated. 341 F.3d 939 (9th Cir. 2003), *overruled on other grounds by Edgerly v. City & Cnty. of San Francisco,* 599 F.3d 946, 956 n. 14 (9th Cir.2010). The Ninth Circuit has subsequently held that *Bingham* remains controlling with respect to a claim for equal protection. *Benson v. City of San Jose*, 583 F. App'x 604, 606 (9th Cir. 2014). In these cases, the Ninth Circuit held that defendants were entitled to summary judgment on the equal protection claim given the lack of evidence that the police department had a practice, or engaged in a pattern of seizing African-Americans, or that the officers made race-related remarks during their encounter with the plaintiff. *Id*. Redmond has offered no such evidence, and the circumstantial evidence she points to is insufficient to create a triable issue of fact for trial.

Accordingly, Defendants have demonstrated that no genuine issue of material fact exists, and Redmond cannot point to evidence that raises a genuine issue for trial on her equal protection claim against the officers. Redmond's unsupported allegations that the littering was a pretext and that the officers approached her vehicle solely because she and Evans are African American is not enough for a reasonable jury to conclude that the officers denied her equal protection of the laws. For these reasons, Officers Pfiefer, Blackerby and Diep are entitled to summary judgment on Redmond's equal protection claim.

Defendants further argue that because there is no constitutional violation, and no evidence that the City had any racially discriminatory policy, the *Monell* claim based on an equal protection violation must also be dismissed. Because the Court finds that there is no triable issue of fact with respect to whether the officers are liable for an equal protection violation, Redmond's *Monell*

claim on this ground must also fail. *See Dougherty v. City of Covina,* 654 F.3d 892, 900 (9th Cir.2011) ("A government entity may not be held liable under 42 U.S.C. § 1983, unless a policy, practice, or custom of the entity can be shown to be a moving force behind *a violation of constitutional rights*.") (emphasis added) (citing *Monell v. Dep't of Soc. Servs. of the City of New York,* 436 U.S. 658 (1978)). Without a constitutional injury resulting from the officers' actions, the City cannot be held liable for a violation of the Fourteenth Amendment.

As a result, Defendants' motion for summary judgment on Redmond's equal protection claim is GRANTED as to Officers Pfiefer, Diep, Blackerby, and the City.

## IV. ORDER

For the foregoing reasons, IT IS HEREBY ORDERED that:

1.  Defendants' motion for summary judgment is GRANTED as to all claims against Officers Mishaga and Wong;

2.  Defendants' motion for summary judgment on Redmond's First Amendment Claim is DENIED as to Officer Pfiefer and GRANTED as to the remaining officers;

3.  Defendants' motion for summary judgment on Redmond's claim for excessive force in violation of the Fourth Amendment is DENIED as to Officer Pfiefer and GRANTED as to the remaining officers;

4.  Defendants' motion for summary judgment on Redmond's claim for unlawful arrest in violation of the Fourth Amendment is DENIED as to Officer Pfiefer and GRANTED as to the remaining officers;

5.  Defendants' motion for summary judgment on Redmond's claim for unlawful search of her person in violation of the Fourth Amendment is GRANTED as to all officers;

6.  Defendants' motion for summary judgment on Redmond's claim for unlawful search of the vehicle in violation of the Fourth Amendment is GRANTED as to all officers;

7.  Defendants' motion for summary judgment is GRANTED as to all claims for violations of the First and Fourth Amendments against Sergeants Perrier and Galea;

8.    Defendants' motion for summary judgment on the *Monell* claims against the City based on violations of the First and Fourth Amendments is GRANTED;

9.    Defendants' motion for summary judgment on Redmond's Bane Act claim is DENIED as to Officer Pfiefer and the City, and GRANTED as to the remaining officers;

10.   Defendants' motion for summary judgment on Redmond's battery claim is DENIED as to Officer Pfiefer and GRANTED as to Officer Hoskin;

11.   Defendants' motion for summary judgment on Redmond's false arrest/false imprisonment claim is DENIED as to Officer Pfiefer and GRANTED as to the remaining officers;

12.   Defendants' motion for summary judgment on Redmond's intentional infliction of emotional distress claim is GRANTED as to all officers;

13.   Defendants' motion for summary judgment on Redmond's negligent infliction of emotional distress claim is DENIED as to Officer Pfiefer and GRANTED as to the remaining officers;

14.   Defendants' motion for summary judgment on Redmond's Equal Protection claim is GRANTED as to all officers and the City.


Dated: November 16, 2017

_____
BETH LABSON FREEMAN
United States District Judge